2008 WY 99

**In the Matter of the Worker's Compensation Claim of Robert NAGLE, Jr.:**

**Robert Nagle, Jr., Appellant, (Employee/Claimant),**

v.

**State of Wyoming, ex rel., Wyoming Workers' Safety and Compensation Division, Appellee, (Respondent).**

No. S–07–0222.

Supreme Court of Wyoming.

Aug. 19, 2008.

Representing Appellant: Sean W. Scoggin of Tiedeken & Scoggin, P.C., Cheyenne, Wyoming.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; John W. Renneisen, Deputy Attorney General; Steven R. Czoschke, Senior Assistant Attorney General; and Kristi M. Radosevich, Senior Assistant Attorney General.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

HILL, Justice.

[¶ 1] On January 5, 1987, Appellant, Robert Nagle, Jr. (Nagle), suffered an open fracture, dislocation and crush injury to the first, second, and fourth metatarsals of his left foot. Since then, he has continued to experience worsening medical complications, which he claims can be traced to that injury. Over the course of the intervening years, Nagle received worker's compensation benefits for the treatment associated with these ongoing problems. In 2003, he sought an award of permanent total disability benefits. By letter dated April 22, 2003, the Wyoming Workers' Safety and Compensation Division (Division) denied his claim for permanent total disability benefits. Nagle also sought benefits for a "second compensable injury" that occurred when he fell in a parking lot and injured his wrist and hip. His claim is that his left foot and leg "gave out," causing him to fall. The Division denied that claim as well. Nagle objected to both determinations and requested a hearing.

[¶ 2] A hearing concerning both issues was held before the Medical Commission on February 8, 2006, and it denied relief to Nagle in an order dated May 22, 2006. On June 8, 2006, Nagle filed a petition for review in the district court. In a decision letter filed of record on August 3, 2007, the district court affirmed the Medical Commission. Nagle timely filed his notice of appeal to this Court on September 4, 2007. After briefing and assignment to the Court's expedited docket, the case was taken under advisement by this Court on February 5, 2008.

[¶ 3] In this appeal, Nagle contends that the Medical Commission's decision was arbitrary, capricious, and not supported by standing case law, or by substantial evidence presented at the hearing. Because there is not substantial evidence to sustain the Medical Commission's determination, we will reverse the district court's order affirming the Medical Commission and remand this matter to the district court with directions that it further remand the case to the Medical Commission with directions that it award permanent total disability benefits to Nagle. In addition, it shall direct the Medical Commission to order that Nagle be paid benefits for the injuries he suffered to his wrist and hip when he fell in 2001, which were caused by the gait/walking instability associated with his mutilated left foot.

## ISSUES

[¶ 4] Nagle raises these issues:

I. Whether the Medical Commission's decision that Mr. Nagle was not entitled to permanent total disability benefits was arbitrary and capricious and not supported by the standing case law.

II. Whether the Medical Commission's decision that Mr. Nagle's medical treatment for his wrist and hip was arbitrary and capricious and not supported by the substantial evidence presented at the hearing.

The Division responded:

I. Whether the Medical Commission Hearing Panel's determination, that Mr. Nagle failed to prove his entitlement to permanent total disability benefits, was arbitrary or capricious?

II. Whether the Medical Commission Hearing Panel's determination, that Mr. Nagle failed to prove the relatedness between his 1987 left foot injury and his recent wrist and hip injuries, was arbitrary or capricious?

## FACTS AND PROCEEDINGS

[¶ 5] We noted above that Nagle injured his left foot on January 5, 1987. Treatment of the injury required five surgical procedures that took place between January 7, 1987, and February 12, 1993. He continues to receive treatment for that injury until this day, and that treatment is paid for by the Division. Nagle received temporary total disability benefits for approximately a year

after the injury. He was able to return to light duty work and was employed intermittently from 1988 until 2001. He was on sick leave for a year after that and in 2002, he retired on Medicare/Social Security disability and has not returned to employment since that time.

[¶ 6] Wyo. Stat. Ann. § 27–14–102(a)(xvi) (LexisNexis 2007) defines "permanent total disability:" " 'Permanent total disability' means the loss of use of the body as a whole or any permanent injury certified under W.S. 27–14–406, which permanently incapacitates the employee from performing work at any gainful occupation for which he is reasonably suited by experience or training[.]" Wyo. Stat. Ann. § 27–14–406 (LexisNexis 2007) provides:

(a) Subject to W.S. 27–14–602, upon certification by a physician licensed to practice surgery or medicine that an injury results in permanent total disability as defined under W.S. 27–14–102(a)(xvi), an injured employee shall receive for eighty (80) months a monthly payment as provided by W.S. 27–14–403(c) less any previous awards under W.S. 27–14–405 which were involved in the determination of permanent total disability, and dependent children shall receive an award as provided by W.S. 27–14–403(b). The monthly payment amount computed under W.S. 27–14–403(c) and any amount awarded under W.S. 27–14–408 shall constitute the exclusive benefit for both the physical impairment and the economic loss resulting from an injury, including loss of earnings, extra expenses associated with the injury and vocational rehabilitation. An employee shall not receive benefits under this section if receiving benefits under W.S. 27–14–404 or 27–14–405.

(b) This section specifies the length of time amounts computed pursuant to W.S. 27–14–403(c) are to be awarded and except for amounts awarded under W.S. 27–14–408, shall not be construed to allow awards in excess of the amounts computed pursuant to W.S. 27–14–403(c).

(c) Any objection to a final determination pursuant to this section shall be referred to the medical commission for hearing by a medical hearing panel acting as hearing examiner pursuant to W.S. 27–14–616.

[¶ 7] The only person who testified at the hearing on this matter was Mr. Nagle. In this regard, we must keep in mind our rule that the testimony of an injured worker alone is sufficient to prove an accident if there is nothing to impeach or discredit the worker's testimony, and the worker's statements are corroborated by surrounding circumstances. Moreover, the occurrence of injuries resulting from accidents to which there are no eyewitnesses does not prevent fair inferences from being drawn and findings of facts from being made. *Ikenberry v. State ex rel. Wyoming Workers' Compensation Division*, 5 P.3d 799, 803 (Wyo.2000). This most directly applies to Nagle's contention that it was the disabled condition of his left foot and leg that caused him to stumble and fall, injuring his wrist and hip, but it also applies to his permanent total disability claim. In this regard, we are also called upon to consider Nagle's fall in light of the second compensable injury rule. *Alvarez v. State ex rel. Workers' Safety and Compensation Division*, 2007 WY 126, ¶¶ 18–28, 164 P.3d 548, 552–55 (Wyo. 2007).

[¶ 8] Mr. Nagle was 50 years of age in 2006, and his educational attainment was a high school diploma (and a few college courses before 1974). In 2003 he took a pre-English class because he was not very good in English, but had not done anything since to follow up on that. Nagle also took some courses (six or eight classes) after his injury, through a junior college, to try to develop "something to fall back on." Nagle lived in Newcastle until age 12, graduated from a New Mexico high school in 1974, and returned to live in Wyoming in 1977. He has lived and worked in or around Newcastle since then. In 1978 he began working in a coal mine and continued that work for 24 years, until he was no longer able to do the tasks required of him in his line of work because of his injury.

[¶ 9] Nagle related the extent of his injuries and the course of treatment over the years 1987–2002, in detail, but we will not include that material here because it does not

affect any of the issues raised in the appeal. Suffice it to say that the gist of Nagle's testimony was that by 2002, he was totally disabled. Nagle drove from Newcastle to Cheyenne for the hearing in this case, but was not driving back home that same day. Mr. Nagle lives alone. In 2002, he went on Social Security disability. In addition to the disabling injury to his foot, Nagle has a "flutter" in his heart for which he takes medication, but that condition imposes no restrictions on his ability to function on a day-to-day basis.

[¶ 10] Although the record is not clear as to the exact date when the event occurred, Nagle fell in the parking lot of a Wal–Mart store when "his leg gave out" because he had walked too much (probably just before Christmas in 2001). He injured himself generally in the fall, but most specifically, he broke his wrist which eventually required surgical treatment. He sought treatment in Newcastle at that time, but no perceptible injury was diagnosed. However, when he continued to experience pain in his wrist and hip, he sought treatment from John Barrasso, M.D., a Casper orthopedic surgeon. Dr. Barrasso provided treatment for Nagle beginning immediately following his 1987 injury and until the time of the hearing on this matter. Nagle reported that he had no problems with his wrist prior to that fall.

## DISCUSSION

### Permanent Total Disability under the Odd Lot Doctrine

[¶ 11] This case involves issues which we have considered with some frequency in recent years. We will apply our recently revised standard of review in order that the result in this case may be conformed to the governing statutes, the relevant facts, and the applicable case law. *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶¶ 8–27, 188 P.3d 554, 557–562 (Wyo.2008). In addition, we are called upon to review this case in light of the odd lot doctrine:

> ... This court has long recognized the odd lot doctrine with respect to permanent total disability determinations made within the purview of the Wyoming Worker's

Compensation Act. In the case of *Schepanovich v. United States Steel Corp.*, 669 P.2d 522, 525 (Wyo.1983) this court stated:

> In our opinion in *Cardin v. Morrison–Knudsen, Wyo.*, 603 P.2d 862 (1979), this court adopted a definition of the "odd-lot doctrine" as follows:
>
>> "... The 'odd-lot doctrine' is described in 2 Larson, Law of Workmen's Compensation, § 57.51 at p. 10–109 (1976), as providing that permanent total disability 'may be found in the case of workers who, while not altogether incapacitated for work, are so handicapped that they will not be employed regularly in any well known branch of the labor market.'" 603 P.2d at 863–864.
>
> An injured workman who comes within the "odd-lot doctrine" need not show that he is totally incapable of doing any work at all in order to be entitled to an award for permanent total disability. *E.R. Moore Co. v. Industrial Commission*, 71 Ill.2d 353, 17 Ill.Dec. 207, 376 N.E.2d 206 (1978); *Wilson v. Weyerhaeuser Company*, 30 Or.App. 403, 567 P.2d 567 (1977); and 2 Larson, Workmen's Compensation Law, § 57.51, at 10–164.21 (1982). This court has stated the proposition in this fashion:
>
>> "... The theory of counsel for the employer appears to be that the workman must go further than to show that he cannot do any hard work; that he must also show that he cannot do light work. Of course, it would almost be impossible, in many instances, for a man educated only to do hard work, to show that at some time or other some good Samaritan might not turn up and offer him some light work which he might be able to do. The law does not require impossibilities. It is stated in 71 C.J. 1071 that 'where it is found that the employee is permanently and totally disabled so far as hard or manual work is concerned, but that he might do light work of a special nature not generally available, the burden is on the employer to show that such special work is available to the em-

ployee.' ...." *In re Iles,* 56 Wyo. 443, 452, 110 P.2d 826 (1941).

This court went on further to enunciate in *Schepanovich,* at 528:

The burden of proof initially is assigned to the injured workman who is seeking to qualify as permanently totally disabled under the "odd-lot doctrine" to demonstrate that he is incapacitated "from performing any work at any gainful occupation for which he is reasonably suited by experience and training." Section 27–12–405(a), W.S.1977; *Cardin v. Morrison–Knudsen, supra.* The test to be invoked is whether the workman is so disabled that the services which he is reasonably equipped to perform by his experience and training are not marketable in a well-known branch of the labor market in the community so as to provide a steady and continuous source of income rather than sporadic or intermittent employment. See 2 Larson, Workmen's Compensation Law, § 57.51 (1982). If that showing is made, the burden of proof is then shifted to the employer to show that light work of a special nature which the employee could perform but which is not generally available in fact is available to the employee. *In re Iles, supra; Cardin v. Morrison– Knudsen, supra.*

Finally, this court adopted the following rule formulated in 2 Larson, *Workmen's Compensation Law,* § 57.61, at 10–164.95 to 1–164.114 (1982) through its opinion in *Schepanovich,* at 528–29:

" ... If the evidence of degree of obvious physical impairment, coupled with other facts such as the claimant's mental capacity, education, training, or age, places claimant prima facie in the odd-lot category, the burden should be on the employer to show that some kind of suitable work is regularly and continuously available to the claimant. Certainly in such a case it should not be enough to show that claimant is physically capable of performing light work, and then round out the case for noncompensability by adding a presumption that light work is available...."

"The corollary of the general-purpose principle just stated would be this: If the claimant's medical impairment is so limited or specialized in nature that he is not obviously unemployable or relegated to the odd-lot category, it is not unreasonable to place the burden of proof on him to establish unavailability of work to a person in his circumstances, which normally would require a showing that he has made reasonable efforts to secure suitable employment...."

Other jurisdictions in this context have held that an employee in circumstances similar to those of the appellant must show that reasonable efforts have been made to obtain suitable employment in order to meet their burden of proof and shift the burden of proof to the employer. *Wiedmaier v. Industrial Commission,* 121 Ariz. 127, 589 P.2d 1 (1978); *Oliver v. Wyandotte Industries Corporation,* Me., 360 A.2d 144 (1976); *Marez v. Kerr–McGee Nuclear Corporation,* 93 N.M. 9, 597 P.2d 1178 (1978) (Sutin, J., specially concurring); *Haines v. State Accident Insurance Fund,* 27 Or.App. 793, 558 P.2d 367 (1976); *Shealy v. Algernon Blair, Inc.,* 250 S.C. 106, 156 S.E.2d 646 (1967). See also cases cited in 2 Larson, *Workmen's Compensation Law,* § 57.61 at 10–164.114, n. 29 (1982).

. . . .

In § 27–14–102(a)(xvi) (Lexis 1999) there appears a definition of permanent total disability, which reads as follows:

(a) "Permanent total disability" means the loss of use of the body as a whole or any permanent injury certified under W.S. 27–14–406, which permanently incapacitates the employee from performing work at any gainful occupation for which he is reasonably suited by experience or training.

The claim of Vaughan that he is totally disabled is presented under the phrase relating to a condition which "permanently incapacitates the employee from performing work at any gainful occupation for which he is reasonably suited by experience or training." It is of significance that the legislature specifically used the words

"gainful occupation" in this definition which suggests its concurrence with those policy considerations utilized previously by this court in support of the adoption of the odd lot doctrine. In fact, this court has previously recognized the statutory definition for permanent total disability is consistent with the odd lot doctrine. *Gilstrap v. State ex rel. Workers' Compensation Div.*, 875 P.2d 1272, 1274 (Wyo.1994) (citing *City of Casper v. Bowdish*, 713 P.2d 763, 765 (Wyo.1986) and *Cardin v. Morrison–Knudsen*, 603 P.2d 862, 863–64 (Wyo. 1979)).

*Vaughan v. State ex rel. Workers' Compensation Division*, 2002 WY 131, ¶¶ 8–12, 53 P.3d 559, 562–63 (Wyo.2002).

[¶ 12] Nagle filed two separate claims, one for permanent total disability and a second for benefits associated with his second compensable injury (the fall in the Wal–Mart parking lot). Eventually, both cases were referred to the Medical Commission. The Division's rules specifically provide that cases involving whether a claimant is permanently totally disabled should be assigned to the Medical Commission (see Chapter 6, Section 1(a)(i)(B)), and the governing statute requires it.

[¶ 13] A significant problem in this case is that the Medical Commission did not look at this case under the strictures of the odd lot doctrine as presented in the applicable case law. Rather, it took a very narrow view of what constitutes "permanent total disability," and, for the most part, disregarded Nagle's evidence and the burden of proof that largely fell to the Division and the employer.

[¶ 14] The record irrefutably established that the degree of Nagle's obvious impairment, coupled with his mental capacity, education, training, and age, placed him prima facie in the odd lot category. That being the case, the burden of proof shifted to the employer to show that light work of a special nature which the employee could perform, but which is not generally available, in fact is available to the employee. It is the Division that failed in its burden of proof, not Nagle.

[¶ 15] While the Medical Commission is presumed to have "special expertise" in parsing medical testimony, medical records, etc., it also has an obligation to apply its fact-finding expertise in a manner that conforms itself to the governing law. The evidence presented by the Division at that hearing did not appear to have been developed in response to the issues that are at large in this case, but rather solely to the narrow definition of "permanent total disability" without taking into account the odd lot doctrine. The evidence presented by Nagle established that he qualified to be considered for permanent total disability under the odd lot doctrine. The burden then shifted to the Division to present evidence that some special work of a light or sedentary nature was actually available to him. Otherwise, he would qualify as a permanently disabled worker under the odd lot doctrine. The Division failed to do this, and the record supports only a conclusion that Nagle is permanently incapacitated from performing any work at any gainful occupation for which he was reasonably suited by experience and training.

[¶ 16] It was an uncontested underlying fact that Nagle received disability benefits from Social Security. Nagle had worked at a sawmill, in the oil fields, and in a coal mine, doing such jobs as laborer, oiler, loader operator, panel operator, a lead man, and a blast hole driller. Contrary to the Medical Commission's findings, he did look for work, albeit not in a way that the Commission approved of, but in a manner consistent with his experience as a laboring man, i.e., he called on employers in person to see if they had work available. However, as noted above, that finding was not relevant to the requirements of the odd lot doctrine because the burden was on the Division to show that there was work available that was suited to Nagle—Nagle did not have to demonstrate that he searched for work and could find none (although he did do that in his own way).

[¶ 17] Earlier in our discussion, we noted that Nagle drove to Cheyenne for the hearing. That information was elicited from Nagle by the attorney for the Division for

the apparent purpose of demonstrating that Nagle was not permanently and totally disabled. The Commission noted that fact in its findings. However, we conclude that the notation is irrelevant because all we know is that Nagle drove to Cheyenne, not how long it took, or how many stops he made, or if he suffered great pain in making that drive. The mere fact that he drove to Cheyenne is of no consequence to any issue at large in this case.

[¶ 18] The Medical Commission made findings that Nagle was able to do sport hunting for the apparent purpose of concluding that, if he could hunt, then he was probably able to work. That finding is not supported by the record, because Nagle's unrebutted testimony was that while he rode along with friends when they went hunting (those friends also took him for rides in their vehicles), he was not able to hunt except with considerable assistance. In any event, the efforts Nagle made to go hunting do not serve to support any of the Medical Commission's ultimate conclusions.

[¶ 19] The Division offered no live witnesses at the hearing but did provide the Medical Commission with seven exhibits. *Exhibit 1* was from an organization named "QuickLook" and was commissioned by the Division for the purposes of the hearing into Nagle's instant claims. It was entitled a "Functional Capacity Evaluation Summary Report." It contained only bare conclusions with no supporting factual information. The only real purport of that document was that Nagle's subjective reports of pain were not reliable, and objective criteria should be consulted and considered more reliable.[1] The objective criteria were not included with the report, nor did any person who conducted the testing appear at the hearing. The report had a hand-written notation on it that

looked like this: "Robert, You have the testing FCE Rpt." Also, the following document was attached to that report, apparently inadvertently:

Robert,

I reviewed all the medical records, briefly and found NOTHING about any bone scan. I did review the FCE and attached only those things I wanted you to review. I am sure you have the complete FCE in your files. He did not put forth full effort and stated to the evaluator that his heart beat was slow because he had taken his HEART medication. She also stated that he was NOT permanently disabled. He has had back surgery and he is 50% at severe disability, however; this is not WC. The Pain assessment questionnaire did state that he had inappropriate illness behavior by the Waddell's test.

I don't know how that will stand up in any hearing but I do know that another doctor stated that his foot problems are not coming from his back problems. It does stand alone, however; the type of pain radiating into his buttocks and leg could be from that back pain/surgery he had.

This is just a little bit that I could find for you. If you need additional help, please let me know. I can be reached by email much better than by phone. . . .

Thank you for your help,

Josie

[¶ 20] In Paragraph 3 of its findings, the Medical Commission accurately notes that Nagle continued to work for his employer in occupations for which he was suited by experience or training, in a "light duty" capacity for 13 years, until such time as he was no longer able to do light duty work. This is confirmed by Nagle's testimony, by the docu-

---

1. In this regard, we refer our readers to our opinion in *Tarraferro v. State ex rel. Wyoming Medical Commission*, 2005 WY 155, ¶ 5, 123 P.3d 912, 914, n. 1 (Wyo.2005) wherein we noted:
 Of course, one of the limitations of medical science is that the body's five classic senses cannot provide any information to a diagnostician: "The examiner cannot see the pain, hear the pain, touch the pain, taste the pain, or smell the pain. Worse yet, though in an age of medical miracles, we cannot X-ray the pain, measure it like serum levels of hemoglobin or sodium, plot it on graph paper like an EEG, or cut it out like a tumor. There are no measuring devices like voltmeters to tell us whether a patient is experiencing mild, moderate, or severe pain. In short, there is no objective direct tangible physical evidence for pain itself." 6B Lawyers' Medical Cyclopedia of Personal Injuries and Allied Specialties, § 44A.1, at 251 (LEXIS Publishing 2000).

mentation from Dr. Barrasso, and from Dr. Barrasso's deposition.

[¶ 21] *Exhibit 2,* was not pertinent to any issue in the case. *Exhibit 3* was a Functional Capacity Evaluation prepared by Todd Gentzler, MPT. In his 7–page report he concluded:

> The above results indicate that Mr. Nagle qualifies to work consistently at the ***heavy work*** category; however I do think that because of his past medical history, it would be more appropriate to keep him in more of the ***medium category.*** I do think he would be able to work with modifications at work, such as sitting for some time and standing for some period of time and being able to move around in different positions. The medium classification states that he should be able to occasionally lift 50 pound[s], frequently lift 20 pounds and constantly lift 10 pounds. Clearly, he exceeded all of this testing while doing the FCE over 4 hours in the clinic. [Emphasis added.]

[¶ 22] This particular exhibit is, of course, so at odds with Nagle's live testimony, the reports of his physician, Dr. Barrasso, who treated him over a period of 17 years, and all other physicians who examined him (with the exception of Dr. Kaplan), as to strain its credibility to the breaking point. We conclude that the Medical Commission could give no weight to this report and it should not have relied on it in its finding in Paragraph 9.

[¶ 23] *Exhibit 4* was a Vocational Evaluation report that was prepared for the Division in September of 2004. The report concluded that work had been available to Mr. Nagle over the past six months and that openings were expected in the next six months for several positions, including: a person to market cell phone packages on the phone (apparently from home); a security guard/gate guard; and outside delivery (courier/messenger). None of these positions were available in Newcastle, where Nagle lived and owned his home. This item of evidence did not function to fulfill the Division's burden of proof and did not serve to support any of the Medical Commission's findings.

[¶ 24] *Exhibit 5* was an "Independent Medical Evaluation" prepared by Michael Kaplan, M.D., that was commissioned by the Division. Dr. Kaplan looked at many of the papers in Nagle's file, but reached conclusions that were the opposite of Nagle's treating physician (and all other physicians). He suggested that Nagle could work in the "medium capacity." This was based upon Exhibit 1 and not on testing that Dr. Kaplan did himself. The last paragraph of Dr. Kaplan's letter was a lengthy disclaimer stating that his opinion was basically only as good as the information provided to him. Some of the materials he reviewed do not appear in the record that was created at the hearing and were not available to the Medical Commission, so far as the record shows. Dr. Kaplan's description of Nagle's "Present Complaints" suggests that he did not review Dr. Barrasso's information with care, if he did so at all. In "Functional History," Dr. Kaplan indicated that Nagle enjoyed "hunting, fishing, and hiking." Such a conclusion is wholly implausible given the bulk of the medical and other records in this file. Dr. Kaplan was unable to connect any of Nagle's complaints to his original injury, whereas Dr. Barrasso related all of Nagle's complaints to the original injury (as did all the other physicians)—and he had personally observed Nagle's complex set of problems as they developed over a 17–year time span. Dr. Kaplan's assessment may, in part, be explained by this excerpt from his report:

> He also describes a bad right knee, which continues to bother him, as well as the left knee. He was a very fast-speaking historian, somewhat difficult to follow, with a severe somatic focus. He also would come directly into this examiner's space, touching the medical record and writing surface, and I informed him it was difficult for me to interview him under those circumstances. He was constantly moving in the room, leaning on furniture. Some of these physiologic behaviors have been observed by prior examiners including the occasion when the vocational evaluation report was

completed and subsequently dictated. I have reviewed that document today.

[¶ 25] *Exhibit 6* was a report of a statewide "internet job search" done by Leslie Wolfe, MSW, LCSW, on September 21, 2004. It listed a number of jobs that the evaluator thought Mr. Nagle could perform (including some of those listed above). However, only one of those jobs was in Newcastle, and that was working as a "hotel clerk," (there was "one current opening" in that field in Newcastle). This exhibit does not serve to support the Medical Commission's ultimate conclusions.

[¶ 26] *Exhibit 7* was an "Adult Neurologic Evaluation" of Mr. Nagle, performed on April 11, 2005, by Black Hills Neurology. It verifies much of Dr. Barrasso's documentation and testimony, but does not support the Medical Commission's ultimate conclusions in any way.

 [¶ 27] Although neither counsel for the parties, nor the Medical Commission, had much luck in getting "to the point" in light of the rigorous standards that apply to the odd lot doctrine, Dr. Barrasso's testimony was the most complete and credible information offered before the Commission. Dr. Barrasso was asked if he ever felt Nagle was untruthful in his reporting, and Dr. Barrasso said "No." He related the course of treatment in summary form. His additional testimony was focused on Nagle's condition and circumstances at the time of the hearing. He testified:

> He's had ongoing pain problems with that leg [left], various hypersensitive nerves, which isn't unusual with a crush injury. But his pattern of walking has changed, which puts additional strain on his knee and his hip and then his lower back.
>
> . . . .
>
> Just kind of briefly looking at some of the surgery he's had, I see that in 1994, which would have been ten years ago, he had cartilage surgery on the left knee on that inside cartilage, which is the place that the cartilage is more likely to wear out. And that was seven years after his injury.

. . . . ˙

> Well, it had been about over a year since I had seen him. And he had told me that—I asked him how things had gone in the last year. And he told me that during the past year, he had three separate episodes where he was walking at work, had increasing pain and problems on the foot. Each time he had to modify his activity, change his weight-bearing pattern to try to throw his weight to the opposite side of the foot. But he continued to work full time. And it just seemed that the pattern was such that he was having more frequent problems with the foot.
>
> Now, this was ten years after his injury, but it was continuing to really aggravate him at work. And that's why after that discussion, I made that notation that he was going to have continued degeneration of his injured left foot, would continue to give him problems at work and ultimately shorten his full work—and maybe the words should have been "full-time work career," because he was really having a hard time doing this full time.

[¶ 28] At this point in Nagle's treatment, personnel from his employer came to Dr. Barrasso's office and showed him a video of what the work of driving a truck would be like. Dr. Barrasso then filled out a form allowing Nagle to return to work a week later. As noted above, Nagle then continued to work from 1988 through 2001. However, beginning in 1999, Nagle reported more and more difficulties to Dr. Barrasso:

> Well, he's made a real effort to work, has been committed to working, but just has had more and more problems as the years went on, to the point where fifteen years after his work-related injury to his foot, he was having pain, cramping, problems with the entire left leg, left lower extremity. It made it very difficult for him to continue.
>
> ˙ . . . .
>
> The final sentence says, he has always made every effort to work his full job responsibility ... But in spite of multiple surgeries, medication, injections, therapy and time, he is now at a point where it is

my belief he is permanently disabled to function at his job.

. . . .

... But I think the buttocks pain and the leg pain and spasms is all related to walking in an abnormal way for seventeen years or so from the time of his injury.

. . . .

[Dr. Barrasso characterized Nagle's condition as] A progression of his initial injury that changed his pattern of walking and changed the pattern of feedback to his brain from his foot because of the nerves that were injured and crushed. And then over a longer period of time, that continues with abnormal stresses and strains on the other joints and are moving uphill from there, the ankle, the knee, the hip and the lower back.

. . . .

He was walking in an abnormal way because of his foot problems. And it's almost as if you walk with one foot normal and put a stone in your—in the shoe on the other foot. So [you] try to take the weight off of the stone, you'd turn your foot crooked or walk a little funny or change it. If you do that for a five-mile hike, by the end of the hike, your knee is going to hurt, your hip is going to hurt, and your lower back is going to hurt. But it's all because of a stone in your shoe.

And I think that's what's been going on with him. He had a crush injury. He had areas that were very sensitive, bones that were broken and crushed that healed but not in exactly the normal position. And in spite of him trying to work hard and trying to get everything lined up, he continued for seventeen years walking kind of with a stone in his shoe. And there was no way to take the stone out of his shoe, because it was within his foot itself. And that resulted in ongoing pain and deterioration to the point where he really wasn't able to go back and do the kind of work he had done at the time of his injury.

[¶ 29] In response to questioning from counsel for the Division suggesting that Dr. Barrasso did not spend that much time with Nagle, he responded:

When you say how long they took, usually if I see 20 patients in a morning and Bob is one of them, he is always the longest visit and may take the time of three or four other folks. And it's usually a lengthy visit, because he lives in Newcastle, and it's a bit of a drive, and I always spend quite a bit of time with him. And he always shows me either his foot or his ankle or his hip or his knee. And I don't know that I record all of those things. But the visits seem to be extensive.

[¶ 30] Dr. Barrasso conceded that he had not reviewed the Functional Capacity Evaluations noted above, but he did comment:

I don't know that I saw them. He told me about one, and it really disturbed him, because he said they had him down crawling around on the floor like a dog, and he felt he was being treated in almost a subhuman way. And I heard about that at great length.

[¶ 31] The testimony given above followed after a letter Dr. Barrasso wrote to the Division on June 26, 2002, just before Nagle filed his claim for permanent total disability benefits:

I am the orthopaedic surgeon taking care of Robert Nagle for injuries sustained in a work-related accident that occurred in 1987. He had a significant crushing injury to his foot and it has become a disabling situation for him. He has had multiple operations with excision, reconstruction and osteotomies and he continues to have ongoing pain and problems with that leg now fifteen years from the time of his initial injury.

Mr. Nagle has continued to work as an equipment operator for 22 years, but he is having quite a bit of difficulty functioning as an equipment operator. He can no longer sit for more than a couple of hours without his left leg cramping. When he is fatigued, his left leg gives out on him and makes it difficult for him to use that leg to balance. When the fatigue sets in he needs to rest the leg for a day or two to regain use of the leg. As a result of the abnormalities that occurred to the foot, this has changed his pattern of walking and over the last fifteen years he has

developed additional knee pain, hip pain and buttock pain, which results in muscle cramps in the back of his thigh. He has pain with almost all activity and even at rest. He is never pain free. He is at a point where he can no longer stand for more than an hour without severe pain in his foot.

I have tried a number of different treatment modalities on Mr. Nagle including recent injections into the foot, which have given him some temporary relief. He is wearing pads that put local anesthetic through the skin to help relieve some of the pain, but he has now reached the end of the line in his ability to perform his full duties as an equipment operator. He feels that he can longer function as an equipment operator. I have known him and seen him on scores of occasions over the last fifteen years and I believe him. He has always made every effort to work his full job responsibility, but in spite of multiple surgeries, medication, injections, therapy and time, he is now at a point where it is my belief he is permanently disabled to function at his job.

[¶ 32] It is our view that the Medical Commission has distorted this testimony to conclude that Nagle is not permanently disabled under the odd lot doctrine, but only disabled from doing what he once did. However, when all of the evidence is considered in context, the only sustainable conclusion that can be reached based on the evidence available to the Commission, is that Nagle is permanently disabled from doing work at any gainful occupation for which he was reasonably suited by experience and training.

[¶ 33] Other physicians commented on Nagle's condition. Wayne Johnson, M.D., wrote in his report:

Lastly, I do not think the claimant can go back to his previous level of employment as a driller. I think that he is capable of doing sedentary to light work only, something where he could sit down and use his upper extremities, his hands, i.e., like clerical work, answering phones or typing, something that does not require him to be on his feet because he has a diminished standing and walking tolerance of approximately 30 minutes and walking approximately two to three blocks.

[¶ 34] Bryan D. Den Hartog, M.D. commented:

He has developed post traumatic arthritis of multiple joints of his foot and this has become a disabling condition to where it is difficult for him to bear weight for more than a few feet.... He no longer can function as an equipment operator. It is my opinion that he is permanently disabled to function in his previous job.

[¶ 35] Meade Davis III, M.D., commented: "I feel that it is unlikely that he can return to his former work."

[¶ 36] Using this information, the Medical Commission concluded that Nagle was only unable to go back to his job as a driller or truck driver, but that he was not permanently disabled. We have applied the substantial evidence test, and we conclude that when the great weight of the evidence is read fairly and in the context in which it was given, the evidence presented at the hearing does not support the Medial Commission's conclusions. On the contrary, we conclude that the evidence will support only a conclusion that Nagle is permanently and totally disabled from further pursuing gainful employment as contemplated by the odd lot doctrine.

### Nagle's Fall Injuries and the Second Compensable Injury Rule

[¶ 37] The standard of review to be applied here is well-summarized in *Alvarez v. State ex rel. Workers' Safety and Compensation Division*, 2007 WY 126, ¶¶ 17–22, 164 P.3d 548, 552–54 (Wyo.2007):

In contrast, in Ms. Alvarez's case the fact that she fell as she was leaving a physical therapy appointment for treatment of her work injury was not the only factor linking the work injury and the subsequent injury for which she sought benefits. Ms. Alvarez initially tore the supraspinatus tendon of her left rotator cuff at work when she was attempting to assist a patient. Surgery was performed to repair the torn tendon. Two months later, with her arm still in a sling, Ms. Alvarez fell twice, the first time as she was leaving her

physical therapy appointment, and tore the same tendon that had been previously repaired. Another surgery was performed to repair the second tear. Ms. Alvarez's doctor testified that the re-tear was related to the original work injury. Thus, unlike the situation in [*State ex rel. Wyo. Workers' Safety and Compensation Division v.*] *Bruhn* [951 P.2d 373 (Wyo.1977)] here the only factor linking the death and the work injury was that the death occurred when the employee was traveling from a doctor's appointment necessitated by the work injury, Ms. Alvarez presented medical testimony from which she could argue a direct causal connection between the original tear and the re-tear, i.e. her rotator cuff would not have been torn and required a second surgery after she fell if she had not previously torn it at work predisposing her to a re-tear.

Given this distinction, *Bruhn* does not control the outcome of Ms. Alvarez's case. Instead, the outcome is controlled by our cases involving the second compensable injury rule. The second compensable injury rule applies when an initial compensable injury ripens into a condition requiring additional medical intervention. *Yenne–Tully v. Workers' Safety & Comp. Div.*, 12 P.3d 170, 172 (Wyo.2000). Under the rule, a subsequent injury is compensable if it is causally related to the initial compensable work injury. *Id.*

A review of the cases in which we have applied the second compensable injury rule is instructive. In *Casper Oil Co. v. Evenson*, 888 P.2d 221 (Wyo.1995), an employee injured his back at work in 1989 resulting in surgery three months later. The Division awarded him benefits for that injury. Approximately nine months after the work injury, and after the initial surgery, the employee slipped and fell at home. He reported the fall to his doctor, stating that it had aggravated his work injury. There was no contention the fall was work related. Three years later, when his back problems persisted, his doctor performed a spinal fusion. The employee filed a report of injury and, after a contested case hearing, the Office of Administrative Hearings (OAH) awarded him benefits for the subse-

quent back injury. The employer appealed, claiming there was insufficient evidence to support the hearing examiner's determination that the 1993 spinal fusion was related to the 1989 work injury. We affirmed the award of benefits on the basis that the spinal fusion was a second compensable injury causally related to the work injury.

We reached the same result in *Pino v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 996 P.2d 679 (Wyo.2000), where the employee injured his back at work and received benefits as a result. Over a year and a half later, he coughed as he was getting out of the shower, heard a pop and experienced pain. His doctor diagnosed a herniated disc. The employee applied for benefits and the Division denied his claim. The hearing examiner concluded:

6. Pino has failed to meet his burden. The evidence does establish that in 1995 Pino suffered a work-related injury which may have resulted in a disc bulge. From 1995 through May 1997, Pino worked but had periodic flare-ups of his low back pain radiating into his legs. He sought medical treatment and these treatments were paid for by the Division. In May 1997, while at home, Pino coughed, felt a pop, and experienced immediate pain in his low back. An MRI in 1997 revealed a herniated disc. It is the opinion of the doctors that the work injury in 1995 weakened Pino's disc and predisposed him to a disc herniation. There is no question that the cough in 1997 caused the disc herniation and caused Pino's current back condition.

7. The medical evidence establishes that the injury in 1995 predisposed Pino to the possibility of a disc herniation. However, doing mundane things at home such as lifting, bending, twisting or coughing can cause a herniated disc. In this case, Pino was at home when he coughed. Pino has failed to establish that his herniated disc was caused by an injury received at work.

*Id.* at 682. This Court reversed, holding the second compensable injury rule applied

and the employee had met his burden of proving the herniated disc was causally related to the work injury. The Court said:

> The thrust of the hearing examiner's disposition is clear; he ruled that the cause of the herniation was a cough that occurred at home not the work place. Yet, there is nothing in the second compensable injury rule that attributes any significance to the place where the worker happened to be when the injury manifested itself nor is any triggering event required. Other cases simply report the increasing severity of the injury over time that ultimately required surgery. In *Evenson*, the triggering event was a slip and fall at home.

*Id.* at 685.

In two more recent cases, we reversed and remanded benefit denials because the hearing examiner did not consider the facts in light of the second compensable injury rule. *Carabajal v. State ex rel. Wyo. Workers' Safety and Comp. Div.*, 2005 WY 119, 119 P.3d 947 (2005); *Yenne–Tully*, 12 P.3d at 170. In *Yenne–Tully*, the employee suffered a work related back injury for which he received medical treatment and worker's compensation benefits. A subsequent CT scan revealed a bulging disc at L3–L4 and "some significant irregularity, primarily at the L5–S1, more minor at the L4–L5 level." *Id.* at 171. Eight years later, he awoke one morning unable to move because of extreme pain. An MRI revealed a herniated disc at L4–L5. After surgery was performed to repair the disc, the employee sought benefits. The OAH denied the claim for benefits. Finding that the second compensable injury rule applied but had not been considered by the OAH, we reversed and remanded the case to the OAH for application of the rule. On remand, the OAH concluded the employee failed to meet his burden of proving a second compensable injury because the only medical opinion presented concluded his injury was primarily attributable to non-work-related causes. We affirmed. *Yenne–Tully v. State ex rel. Wyo. Work-*

*ers' Safety & Comp. Div.*, 2002 WY 90, 48 P.3d 1057 (2002).

In *Carabajal*, the claimant injured his back at work, underwent surgery for a herniated disc at L5–S1 and received worker's compensation benefits for over two years. *Carabajal*, ¶ 3, 119 P.3d at 949. He returned to work and had no further complaints until twenty-five years later, when he experienced back pain as he was walking. He was not at work at the time or engaged in any work-related activity. He sought medical treatment and an MRI revealed scar tissue and a herniated disc at the same level as before. He underwent a microdiscectomy and, when problems persisted, a spinal fusion. His claim for benefits was denied and he requested a hearing. The hearing officer denied his claim on the ground that he failed to prove he sustained a work related injury. *Id.*, ¶ 7, 119 P.3d at 950. As in *Yenne–Tully*, we reversed and remanded the case for the OAH to apply the second compensable injury rule. *Id.*, ¶ 24, 119 P.3d at 955.

[¶ 38] With respect to the injuries that Nagle suffered in his late 2001 stumble and fall, we will be quite brief, as was the Medical Commission. Nagle's report is plausible in every respect. There is no basis for disbelieving his testimony that his leg gave out on him, as it had many times in the past, and as he reported to Dr. Barrasso. There is likewise no factual circumstance contained in the record that would disallow application of the second compensable injury rule. Indeed, it is a classic case of the application of that rule. Thus, as was the case with Nagle's claim for permanent total disability, there is not substantial evidence in the record to support the Commission's conclusions to the contrary.

## CONCLUSION

[¶ 39] The order of the district court affirming the Medical Commission is reversed, and we remand this matter to the district court with directions that it further remand the case to the Medical Commission with

directions that it award permanent total disability benefits to Nagle. In addition, it shall direct the Medical Commission to order that Nagle be paid benefits for the injuries he suffered to his wrist and hip when he fell in 2001 because of his gait/walking instability associated with his 1987 injuries.