2012 WY 32

**In the Matter of the Worker's Compensation Claim of Jimmie McMASTERS, Appellant (Petitioner),**

v.

**STATE OF WYOMING ex rel. WYOMING WORKERS' SAFETY AND COMPENSATION DIVISION, Appellee (Respondent).**

No. S–11–0107.

Supreme Court of Wyoming.

March 2, 2012.

Representing Appellant: Robert Nicholas of Nicholas & Crank, P.C., Cheyenne, Wyoming.

Representing Appellee: Gregory A. Phillips, Wyoming Attorney General; John W. Renneisen, Deputy Attorney General; James Michael Causey, Senior Assistant Attorney General; Kelly Roseberry, Assistant Attorney General.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

GOLDEN, Justice.

[¶ 1] In 2003, Jimmie McMasters (McMasters) was working as a heating, ventilation and air conditioning (HVAC) journeyman when he fell nine feet from a beam to a concrete floor and suffered a compression fracture to his L1 vertebrae. In 2008, McMasters applied for permanent total disability benefits claiming a total disability under the "odd lot" doctrine. The Wyoming Workers' Safety and Compensation Division (Division) denied the application.

[¶ 2] The Division did not dispute that McMasters could not return to work as an HVAC journeyman but instead contended that his failure to obtain alternative employment was due to a preexisting psychological condition and a poor effort to find work. The Medical Commission agreed and upheld the denial of benefits. On appeal, the district court found the Commission's decision to be supported by substantial evidence and affirmed.

[¶ 3] We reverse. McMasters established a *prima facie* case under the odd lot

doctrine when he showed he could not return to his former employment and the combination of his psychological and physical conditions precluded alternative employment. The burden thereafter shifted to the Division to show that light work of a special nature, which McMasters could perform, was available. The Division did not meet its burden.

## ISSUE

[¶ 4] McMasters presents the following issue on appeal:

Did the Panel err, as a matter of law, in concluding that Mr. McMasters failed to meet his burden in establishing that he is Permanently Totally Disabled?

## FACTS

[¶ 5] In the eleven years before his work injury, McMasters worked primarily in construction. Four of those years were as an HVAC apprentice. After he completed his apprenticeship, he worked two years as an HVAC journeyman, which is the position he held when he suffered his work injury.

[¶ 6] On April 17, 2003, McMasters was working for the Casper Tin Shop, installing duct work through a vaulted ceiling at the Childhood Development Center in Casper, Wyoming. The task required McMasters to stand and move about on two-inch wide trusses. He lost his footing and fell approximately nine feet to the concrete floor below, landing on his tailbone. McMasters was unable to get up and was taken by ambulance to the Wyoming Medical Center. What followed were years of treatment and evaluation by numerous medical providers and specialists, and ultimately McMasters' application for permanent total disability benefits.

### 2003

[¶ 7] Dr. Joseph Sramek treated McMasters at the hospital and recorded the following assessment of McMasters' injury and treatment:

The patient had a fall on the job with an L[1] compression fracture. He has no canal compromise from this. It is a 20% compression fracture. I believe this one

can be treated conservatively in a brace with close followup and imaging studies. In all likelihood, he will be out of work at least for 6 to 8 weeks while he wears this brace, unless they can find sedentary work for him. Hank Osborne from High Plains Orthoprosthetics has been consulted to fit him for a Jewett brace. If he gets this in the morning, we can start to have him ambulate with physical therapy to see if he tolerates it. In the meantime, we will provide adequate pain control and he can be discharged tomorrow if he is able to ambulate well with the brace. We will set up additional followup for him on an outpatient basis.

[¶ 8] On May 5, 2003, McMasters had his first follow-up appointment with Dr. Sramek's office. The notes from that visit included the following assessment and plan:

Overall, it appears the patient's low back pain has improved considerably since his hospital discharge. No evidence of fracture progression is seen on radiographic studies and his neurologic examination remains intact.

At this time, we have recommended that he will continue the utilization of the Jewett bracing system for an additional 2 months. He will return in approximately 6–8 weeks for a follow-up visit to include repeat AP/lateral thoracolumbar x-rays centered at L1.

For pain control he will continue his current dosing of Lortab 7.5 mg to be dosed as 1–2 PO Q 6 hrs. PRN pain.

I have completed a work restriction form, which limits his return to work activities until 07/01/2003.

[¶ 9] McMasters had a second follow-up appointment with Dr. Sramek's office on June 11, 2003. McMasters reported an increase in low back pain and low back spasm, which Robert Griffin, Dr. Sramek's PA, attributed to immobilization, "as well as a change in both the static and dynamic positions of the spine." McMasters was instructed to wear his Jewett brace for another four to six weeks and was advised that when the brace was removed, he would be enrolled in physical therapy.

[¶ 10]   On July 10, 2003, McMasters had a third follow-up examination with Dr. Sramek's office.   The entries from that visit indicate that McMasters was improving and reported a decrease in back pain from his last visit.   McMasters was instructed to stop wearing the Jewett brace and to begin an eight-week physical therapy program.   He was again restricted from working during that period.

[¶ 11]   On September 8, 2003, McMasters again saw PA Robert Griffin.   During that examination, McMasters reported significant improvement in his lower back pain as well as in his lumbar spine range of motion.   Griffin made the following entry in the chart for a plan going forward:

> Prior to returning the patient to work activities, I would like to have him undergo a physical capacity evaluation and possible disability rating with Dr. Zondag.   This will be scheduled sometime in the next 3–4 weeks.   At this time we have restricted the patient's return to work status until 10/15/2003.   Dr. Zondag may wish to amend our current return to work plan based on his evaluation.

[¶ 12]   On October 6, 2003, Robert Griffin reviewed additional films that had been taken of McMasters' spine.   He made the following observation:

> Comparison is made to previous studies on 05/05/2003.   Evidence of L1 compression fracture is again seen.   Anterior wedging is approximately 25–30%.   This appears to have slightly increased when compared with the previous study.   More sclerosis is noted about the fracture margins, suggesting adequate healing.   No additional abnormalities are seen.

[¶ 13]   On November 3, 2003, at the request of the Division, Dr. Tuenis D. Zondag examined McMasters for the purpose of providing an Independent Medical Evaluation (IME) and impairment rating.   Dr. Zondag diagnosed a compression fracture at L1 with 30–40% compression.   He noted that McMasters' "subjective complaints are consistent with the objective findings," and "[s]ymptom magnification behavior was not evident."   Dr. Zondag found McMasters had reached maximum medical improvement and calculated a 5% whole body permanent impairment.   Dr. Zondag also found that McMasters could return to work in a heavy work occupation.

### 2004

[¶ 14]   In early 2004, McMasters attempted to return to work for his employer, Casper Tin Shop, but his employer had not held his position.   McMasters then went to work for Sheet Metal Specialties, another Casper company.   On his first day back to work, McMasters aggravated his back injury carrying tools up a ladder.   McMasters worked for two weeks before quitting due to back pain.

[¶ 15]   On April 2, 2004, McMasters saw Dr. Sramek for his back pain.   Dr. Sramek made the following entries in McMasters' chart:

> ASSESSMENT:
>
> Patient has axial back pain at the level of his fracture.   I suspect the fracture is still playing a role.
>
> PLAN:
>
> I am going to get a MRI with stir sequences.   In addition I am going to get some plain x-rays of his back including flexion/extension and I am going to also try to reopen his case with Workers' Compensation as I think the fracture is impairing him from returning to his previous line of work.   I will have him follow-up with me after the studies.
>
> I have also given him some samples of Celebrex and a prescription for Skelaxin 800 mg QHS. I think he should stay off work for now until we get his pain issues further resolved.

[¶ 16]   On April 19, 2004, Dr. Sramek reviewed an MRI of McMasters' lumbar spine.   He observed possible edema at the fracture site and a disc herniation at the L5–S1 level.   He noted none of McMasters' symptoms related to the L5–S1 herniation.   Dr. Sramek referred McMasters for a vertebroplasty, a procedure in which bone cement is injected into the problematic disc to solidify the vertebrae.   McMasters underwent the vertebroplasty procedure on May 20, 2004.   He reported temporary relief from the procedure but then his pain worsened.

[¶ 17] On August 3, 2004, on referral from Dr. Sramek, McMasters saw Dr. Zondag for an occupational medicine and vocational rehabilitation consultation. Dr. Zondag noted that "persistent changes in the MRI prompted Dr. Sramek to encourage Mr. McMasters to consider an alternate job or retraining." Dr. Zondag concluded:

I indicated to Jimmy that given his history and the requirement for vertebroplasty that he is not capable of returning to full HVAC work.

I feel that in an alternate job he will have to stay away from being in a bent position for long periods of time and stay away from twisting. His lift capacity is best within the light to light medium type of physical work capacity based upon Department of Labor Standards.

He reports now that he can tolerate sitting well, but has reduced tolerance for standing and prolonged walking as well as reduced tolerance for working in the bent position for prolonged times or repetitively.

I feel that the patient should be considered for alternate job placement within work that is compatible with his restrictions and/or retraining.

[¶ 18] On September 21, 2004, McMasters, on referral from the Division of Vocational Rehabilitation (DVR), saw Dr. Jack Herter for a psychological evaluation. The purpose of the DVR referral was "eligibility determination and vocational services planning." Dr. Herter's report contained a disclaimer that "[t]his evaluation is *not a Psychological Pain Evaluation or Pre-surgical Psychological Pain Evaluation,* nor is it intended for Workers Compensation Case Management." (Emphasis in original.)

[¶ 19] In preparing his evaluation, Dr. Herter considered McMasters' history and behavioral presentation, and he administered tests to determine McMasters' intellectual functioning and personality functioning. Dr. Herter reported that McMasters' employment history was notable for reasonable periods of stability. With respect to McMasters' intellectual functioning, Dr. Herter noted that McMasters had attended school through the eighth grade and then obtained his GED. He reported further:

Intellectually and academically, Mr. McMasters would be capable of handling vocational-technical level coursework as well as coursework at the community college level; however his Mathematics disorder would require special accommodations. If special accommodations and tutorial assistance fail, he may need a math waiver. Also, personality variables will need to be addressed in your vocational planning.

[¶ 20] With respect to McMasters' personality functioning, Dr. Herter made the following findings:

Mr. McMasters's history suggests a work ethic and potential for maintaining employment stability up to four years.

Mr. McMasters's test data supported high levels of anxiety, depression and worry as well as elevated levels of somatization. All three variables are known to impede the rehabilitation process and to prolong suffering in patients with chronic pain.

Mr. McMasters's data suggest low self-esteem, self-doubt, social introversion and social maladjustment.

Mr. McMasters was the product of an unstable, rejecting and abusing family environment, which left him Axis–II issues. Personality Disorders (DSM–IV Axis–II Psychopathology) are enduring patterns of maladaptive and self-defeating behaviors, beliefs and attitudes, which are pervasive and inflexible over time, have onset in adolescence or early adulthood, and lead to distress or impairment in social, personal or other important areas of functioning. Personality Disorders are viewed as being "traits," which are stable characteristics of the individual's personality, as opposed to "states," which tend to be transient and variable personality and emotional fluctuations. Personality Disorders are generally resistant to psychotherapeutic interventions.

Elevations occurred on measures of Avoidant, Antisocial and Paranoid traits. Avoidant traits facilitated the development of a Panic Disorder with Agoraphobia.

[¶ 21] Dr. Herter completed his report with a recommendation that McMasters be referred to a psychiatrist to assess whether he might benefit from being placed on an antidepressant. He further recommended that any vocational rehabilitation include pain management psychotherapy and cognitive behavioral therapy.

### 2005

[¶ 22] In January 2005, DVR referred McMasters to the Community Health Center of Central Wyoming for psychiatric evaluation by Dr. Larry Plemmons. Dr. Plemmons noted problems with sleeping due to pain, decreased motivation, and problems with concentration and memory. He diagnosed McMasters with a "major depressive disorder," and prescribed an antidepressant.

[¶ 23] During 2005, McMasters continued to see Dr. Sramek for back pain. On June 8, 2005, McMasters saw Dr. Paul Ruttle for a new impairment rating. Dr. Ruttle assigned an 11% whole person impairment rating. He recommended restrictions on McMasters' standing, walking, lifting and bending, and he agreed with Dr. Sramek that McMasters was a poor surgical candidate at that time due to his obesity.

[¶ 24] On December 6, 2005, McMasters was referred to Wind City Physical Therapy for occupational therapy in the chronic pain program. McMasters was discharged on January 24, 2006, with the following report from his occupational therapist:

> Jim presents with negative thoughts and expresses negative behaviors (at home) during therapy requiring maximal verbal cuing to attempt at positive thoughts and behaviors. He continues with negative verbalizations such as "I don't like people telling me to change or that I need to change." "I will get better once these lawsuits I have pending are over, rather [sic] I win or lose." "No one believes me I hurt, I went to one of my lawyers Friday (Hampton Young), and he acted like I was not really in pain." "My back will not get better, the doctors keep telling me I am getting worse and my back is broke." "My pain is physical not mental, this pain program seems like it is telling me my

pain is in my head." Jim states he feels that he has adapted the best way he can in dealing with the pain. Jim is difficult to work with secondary to the negative thoughts and this therapist discussed with Jim the benefits of Cognitive Behavior Therapy for pain and the importance of him being in a stage of his life in which he is willing to make the necessary lifestyle changes in order to increase his quality of life. After much discussion with Jim, it was decided to discharge him from therapy secondary to stating he is not willing to change, "I am a negative person and I will stay that way, no one is going to change me into a positive person, I had a difficult childhood."

### 2006

[¶ 25] On January 27, 2006, Dr. Sramek sent a letter to the Division requesting a referral to Dr. Michael Kaplan, a specialist in spinal diagnostics and pain intervention. Dr. Kaplan saw McMasters on May 11, 2006, and recommended facet injections, which Dr. Kaplan performed on May 25, 2006. This procedure gave McMasters temporary relief from his pain while at rest.

[¶ 26] On June 1, 2006, Dr. Sramek recommended McMasters be administered a steroid injection, and that procedure was performed at the Wyoming Medical Center on June 12, 2006. McMasters reported no benefit from the procedure.

[¶ 27] In that same month, June 2006, the Division referred McMasters to Dr. Herter for evaluation. The stated purpose of the evaluation was "to identify psychological, psychosocial, and cognitive-behavioral factors, apparent and/or suggested, in the examinee's assessment data, self-reported history, medical records, and behavioral presentation, which could potentially impede adaptation to pain and/or potentially pose as threats to medical treatment outcome."

[¶ 28] Dr. Herter met with McMasters on June 13th, 19th, and 27th. He made several specific findings based on his testing and examination of McMasters. These findings included high to extreme levels of depression, and moderately high to extreme levels of

anxiety. Dr. Herter also found that McMasters presented with high to very high levels of somatization, which he explained "is not a conscious process," but is a "process whereby bodily complaints are exaggerated and/or exacerbated by stress and/or by strong emotional states." Among other additional findings was a finding of very high levels of Global Psychological Distress (GPD). Dr. Herter explained:

> [GPD] is frequently observed in the pain patient population. GPD is an extreme emotional response to a catastrophic event or to an event perceived as being a catastrophic threat. For a poorly educated worker, who has relied exclusively on his/her nonverbal and physical abilities to survive, an injury that potentially prevents him/her from using his/her physical abilities to work can be perceived as a catastrophic threat to his/her survival.

[¶ 29] Dr. Herter reported the following conclusions to the Division:

> Mr. McMasters presented with multiple psychological/ psychosocial risk factors, which were discussed in detail in the body of this report. These risk factors have been associated with impaired adaptation to pain, poor pain coping, prolonged disability, low rates of RTW, impaired or problematic compliance with treatment and rehabilitation regimens and less than satisfactory responses to medical treatment interventions, including invasive procedures.

> Mr. McMasters's current psychosocial risk factors could be expected to impede RTW issues as much as they negatively detract from his probability of having successful medical treatment outcomes.

> Mr. McMasters's data was apparent for high levels of Perceived Disability. Mr. McMasters believes that he is disabled. If Mr. McMasters is unable or unwilling to make significant behavioral changes; remains angry; fails to learn effective pain management techniques; remains physically inactive; I would suggest that his probability of returning to any form of gainful employment would be poor.

\* \* \* \*

Treating Mr. McMasters successfully and effectively will be a challenge. He presents with multiple issues of significant complexity. He has a chronic pain disorder associated with both psychological factors (depression, anxiety, somatization and anger) and a medical condition. Though his depression is reactive and part of his pain diagnosis, the level of his depression warranted a diagnosis of major depressive disorder. In light of the level and severity of Mr. McMasters's depression, I would recommend a psychiatric referral for psychoactive medication assessment and management.

Mr. McMasters's anxiety is reactive and part of his pain diagnosis. Anxiety is associated with decreased comprehension of information presented by health care providers. Highly anxious patients become incapacitated with fear and embarrassment, which would appear to be consistent with [what] Mr. McMasters reported. His anxiety evolved into a Panic Disorder with Agoraphobia. Studies indicate that approximately 24% of chronic pain patients experience panic disorders. Panic-afflicted patients tend to avoid certain rehabilitation situations and sometimes become too overwhelmed to leave their homes, which would be consistent with what Mr. McMasters reported. Successful treatment of Panic Disorder with Agoraphobia typically requires a specific Cognitive–Behavioral treatment protocol. Some psychoactive medications can be effective for symptom management, but anti-anxiety agents impede Cognitive–Behavioral treatment. I would recommend a referral to a clinical psychologist specializing in the Cognitive–Behavioral treatment of Panic Disorder.

[¶ 30] Because McMasters' condition failed to improve, Dr. Sramek ordered a repeat MRI scan of his spine, which revealed degenerative disc disease at the L5–S1 level of the spine. Dr. Sramek referred McMasters to Dr. Brian Weider, a neurosurgeon. Dr. Weider noted the degenerative disc disease at L5–S1 and also reported that McMasters "has had diskography, which demonstrates partially concordant disk pain at L1–L2 as well as L5–S1 with nonconcordant pain T12 L1."

### 2007

[¶ 31] In January 2007, Dr. Weider performed an L5–S1 lumbar decompressive laminectomy and fusion surgery on McMasters. On Dr. Weider's referral, McMasters began physical therapy in April 2007. McMasters' July 2007 physical therapy records indicate that McMasters "continues to work very hard with his exercises," and that McMasters reported "feeling a little bit better particularly across his low back."

[¶ 32] On July 12, 2007, Dr. Weider reported to the Division that McMasters had reached maximum medical improvement. Dr. Weider recommended an occupational medicine evaluation to determine work capacity and noted that it "is reasonable to not expect him to return to a position that requires repetitive heavy bending, lifting, and twisting."

[¶ 33] On August 15, 2007, the Division referred McMasters to Dr. Kaplan for a permanent partial impairment rating. Dr. Kaplan performed a medical record review and a physical examination of McMasters, and on August 30, 2007, he issued his rating. Dr. Kaplan awarded McMasters a 23% whole body permanent impairment rating. He also found:

> The patient cannot return to work in construction given his current status. He is likely going to do better in a sedentary to light duty position. He will likely be more comfortable changing positions during the day without a constant sitting exposure throughout his shift.

### 2008

[¶ 34] On January 17, 2008, McMasters saw Dr. Kenneth Pettine, a Colorado surgeon, in an attempt to address his continuing pain. Dr. Pettine examined McMasters and reviewed his records and MRI films. He concluded:

> At this point, I think his current situation is permanent. I do not know that there is anything such as chiropractics or physical therapy which is going to change his current symptoms. I think his options are more or less to live with his symptoms and possibly consider pain management.

[¶ 35] Throughout his treatments, McMasters was continuing to be seen at the Community Health Center in Casper for issues relating to pain, sleeplessness and depression. On July 10, 2008, John Noffsinger, a PA at the Community Health Center, referred McMasters to Dr. Bradley Vilims of the Wyoming Brain and Spine Institute for pain management.

[¶ 36] McMasters saw Dr. Vilims on August 12, 2008. Dr. Vilims examined McMasters and made a "referral to Dr. Jack Herter of pain psychology to deal with and stabilize some of his depression and anxiety issues."

[¶ 37] Dr. Herter saw McMasters on three occasions between October 20, 2008, and December 2, 2008, on referral from Dr. Vilims for a psychological consultation to "determine whether the patient would be stable enough psychologically to pursue a provocation lumbar discography." Dr. Herter expressed the following conclusions:

> Progress in attempting to treat the patient's panic disorder and pain disorder has been minimal and extremely slow. While I am willing to persist in trying to help the patient to move forward, my experience with these types of patients has been that attitudinal and characterological issues (personality disorders) greatly limit the degree of and the potential for significant behavioral change.
>
> In the absence of medical necessity, Mr. McMasters does not appear to be stable enough psychologically, at this time, to pursue a provocation lumbar discography from the standpoint that he would have a strong probability of having a panic attack at some point during the procedure. One possibility might be to consider placing him on a potent anxiolytic during the procedure in an attempt to prevent the occurrence of a panic attack.

[¶ 38] In this same timeframe, Dr. Herter wrote a letter to Social Security Disability Determination Services concerning McMasters' employability. He reported:

> By virtue of his Panic Disorder and Agoraphobia, Mr. McMasters would not be capable of handling full-time, low stress, low demand competitive employment of any

kind on a sustained basis; nor could he be expected to relate appropriately to supervisors and co-workers on a sustained basis; nor could he be expected to handle routine work stress and change.

Mr. McMasters' Chronic Pain Disorder prevents him from being able to handle low stress, low demand competitive employment of any kind on a sustained basis. His Pain Disorder would prevent him from being able to relate appropriately to supervisors and to fellow workers on a sustained basis (e.g., pain causes Mr. McMasters to be extremely impatient, irritable and short-tempered). His Pain Disorder prevents him from being able to handle routine work stress and change on a sustained basis.

Mr. McMasters' Avoidant Personality Disorder and Paranoid Personality Disorder would prevent him from being able to relate appropriately to supervisors and co-workers on a sustained basis.

Mr. McMasters' Major Depressive Disorder would prevent him from being able to handle low stress/low demand competitive employment of any kind on a sustained basis, and would also prevent him from being able to relate appropriately to supervisors and co-workers on a sustained basis, and would further prevent him from being able to handle routine work stress and change on a sustained basis.

Alone or in combination, Mr. McMasters' Panic Disorder, Pain Disorder and Major Depressive Disorder impede concentration, attention and short-term memory in a manner that would prevent him from being able to sustain simple, low stress, repetitive employment of any kind.

*2009*

[¶ 39] In July 2009, the Division referred McMasters to Dr. Meade Davis, III, a board-certified orthopedic surgeon in Cheyenne, for an IME to determine whether McMasters was permanently totally disabled. On July 23, 2009, Dr. Davis spent four hours examining McMasters, reviewing records, and preparing his report. The records he reviewed included the following:

1. Wyoming Employer Report of Injury

2. IME Report from Tuenis Zondag, MD: 11–3–03

3. IME—Michael Kaplan, MD: 8–30–07

4. IME—Paul Ruttle, MD: 6–16–05

5. Miscellaneous communication from Wyoming Worker's Safety & Compensation Division

6. Emergency Report from Wyoming Medical Center: 4–17–03

7. CT scan, lumbar spine Report: 4–17–03

8. Report from Central Wyoming Neurosurgery: 5–5–03

9. Miscellaneous other x-ray reports

10. Office visit Mountain View Clinic: 6–11–03

11. Miscellaneous North Platte physical therapy notes

12. Multiple office visits from Central Wyoming Neurosurgery

13. Occupational therapy notes

14. Operative notes

15. Hospital records

16. Psychology reports

17. Report from Wyoming Brain and Spine Associates: 11–1–06 and 12–12–06

18. Miscellaneous lab tests

19. Other miscellaneous hospital, therapy and office visit notes

[¶ 40] On physical examination, Dr. Davis found decreased range of motion in the lumbar spine and pain with attempted motion in flexion, extension, rotation and sidebending. Dr. Davis provided the following diagnosis:

My diagnosis is status post compression fracture at L1, vertebroplasty of L1, lumbar fusion at L4, L5 with autograph. Mr. McMasters suffers from persistent pain in the lumbar area. There is also aggravating and compounding psychological issues plus weight issues involved in Mr. McMasters['] current condition.

[¶ 41] Dr. Davis reported the following conclusions in response to the Division's questions:

In response to your specific questions and letter dated July 1st, 2009. The question

asked, Is the claimant permanently totally disabled as a result of the injury sustained to the low back in the work injury of April 2003? I feel at this time Mr. McMasters is permanently totally disabled from his injuries sustained at work in April 2003.

\* \* \* \*

In summary Mr. McMasters suffered a back injury, underwent back surgery and has chronic disabling pain in the back and left hip area. He cannot sit for more than about 30 minutes, he can't do much lifting or participate in motion of his spine because of pain. He has a complex psychological disorder. The combination of problems in this gentleman make him probably unsuitable for any employment.

[¶ 42] On August 3, 2009, the Division sent a follow-up letter to Dr. Davis. The Division requested that Dr. Davis clarify the connection he drew between McMasters' hip pain and his lumbar injury and clarify whether he believes McMasters' lumbar injury alone, without consideration of his psychological or weight issues, is the cause of his permanent total disability.

[¶ 43] On August 6, 2009, Dr. Davis responded to the Division with the following additional information:

The question as to whether his lumbar injury alone causes him to be permanently totally disabled, is perhaps not entirely relevant as we take patient's [sic] as we find them. If they have depression and other complicating problems and then you superimpose another injury, i.e. a back injury on top of that they may perfectly well become unemployable, which is what I feel is occurring in this case. This gentleman is probably on the low scale of motivation to work in the first place. We could argue that one gains weight when one is inactive because of pain problems such as low back pain. In our IME report we felt that the left hip discomfort was not related to any graft harvesting. We felt the pain was probably related to his injury as a referral type of pain from the low back and does not reflect hip pathology. It is obviously difficult to find objective evidence when a patient complains of referred pain.

[¶ 44] On August 7, 2009, McMasters was evaluated by Dr. Timothy Blaney, a licensed psychologist in Buffalo. The Division referred McMasters to Dr. Blaney for the purpose of determining his suitability, from a psychological standpoint, for trial implantation of a spinal cord stimulator. After Dr. Blaney evaluated McMasters, but before he issued his report, the Division submitted additional questions concerning the cause of McMasters' psychological conditions and the impact of those conditions on his ability to return to work.

[¶ 45] Dr. Blaney reported that McMasters suffers from, among other conditions, failed back syndrome, chronic pain, and a pain disorder "with Both Psychological Factors and a General Medical Condition." Dr. Blaney observed that based on McMasters' clinical profile, he could be expected to "behave erratically with healthcare providers, alternately distancing and engaging, and often blaming," and he "may actually be too upset to understand or follow medical advice." Dr. Blaney also cautioned that McMasters "is likely to have a much slower recovery, to generate greater expenses, and to have more unanticipated complications to medical procedures due to his emotional condition." He reported the following treatment prognosis:

Because of his psychological profile, Mr. McMasters is at risk for an exaggerated negative reaction to either relatively benign or invasive medical procedures. He may show increasing lethargy, fatigue, and hopelessness that suggest to him that treatments are a failure. Such a pattern of negative self-fulfillment makes true engagement in lifestyle changes and healing unlikely.

[¶ 46] Dr. Blaney reported to the Division that he believed McMasters was at high risk of a negative outcome from further medical procedures, including the spinal cord stimulator implantation. He explained:

[McMasters'] negativity and hopelessness represent both acute depressive symptoms as a consequence of pain, as well as enduring personality variables. The latter has been extensively discussed by Dr. Herter over the course of numerous consultations,

evaluations, and treatment sessions. Based on experiences during childhood, Mr. McMasters has established a rather inflexible and dysfunctional approach to viewing the world. He is negativistic and guarded. His injury, pain, and associated conditions have exacerbated these underlying tendencies for maladjustment.

Mr. McMasters seems [sic] himself as the victim of circumstances and feels incapable of affecting his own fate toward a more positive outcome. He continues to blame others, including physicians, other healthcare providers, Workers['] Compensation staff, and the DVR Counselor for his continued distress, despite his own inactivity and disengagement from needed lifestyle changes. At present, he is extremely discouraged, emotionally fragile, and preoccupied with worry. His perceptions and recollections of his treatment history are quite inconsistent with the medical records. Aside from facet joint injections undertaken in 2006 and 2008, Mr. McMasters *has* in fact benefitted from previous procedures, including the vertebroplasty and the laminectomy/fusion surgery. There is no evidence to support his claim of the bone graft from his hip having been a failure, for example. His allegation of having gained 100 pounds since his injury also appears to be unfounded. Yet, he persists in blaming his self-consciousness, social avoidance, and panic attacks on his weight gain. Rather, the opposite appears more likely. He has gained some weight due to inactivity, but his increasing despondency, social isolation, depression, and anxiety underlie his overeating, smoking, and other negative health habits. [Emphasis in original.]

[¶ 47] In response to the Division's follow-up questions, Dr. Blaney opined that McMasters' personality disorders and psychological conditions were caused by social and environmental factors unrelated to his work injury. Dr. Blaney further explained:

It is estimated that his premorbid adjustment and functioning was likely tenuous. When injured at work, Mr. McMasters was unable to cope effectively with his physical pain, decreased functioning, and unemployment. Resulting stressors were exacerbated by preexisting coping deficits and maladaptive patterns, in addition to developing symptoms of anxiety and depressive disorders. Now unemployed for several years, Mr. McMasters appears to have become wedded to the idea of his own disability, which further impedes his taking necessary steps for self-improvement. So pervasive are his convictions and so entrenched is his negativity, that without addressing underlying psychological features, *no* medical solutions are likely to prove efficacious in the long-term. [Emphasis in original.]

[¶ 48] In response to the Division's question whether McMasters' psychological conditions relate to non-industrial issues, Dr. Blaney agreed, but advised that "his injury, pain, and unemployment have exacerbated underlying conditions and contributed to his present status." In response to the Division's question whether McMasters' psychological conditions impact his ability to return to work, Dr. Blaney opined:

The most significant impediment to future gainful employment is Mr. McMasters' insistence that he is disable[d] and unable to work. This is his essential, unalterable reality, until he elects to change his mind. Although his physicians have repeatedly encouraged less physical work, Mr. McMasters' single attempt to return to work a few months post injury was in the same HVAC field. He has not attempted to work since. His experience with DVR was apparently also unproductive. Should he choose to do so, Mr. McMasters would seem capable of performing well in a low physical-impact, low-stress job in an area of personal interest. In order to maintain his employment, he would likely need to persist in managing his symptoms of anxiety and depression, both with continued medication and counseling.

### 2010

[¶ 49] In March 2010, McMasters consulted Reg Gibbs, MS, a certified rehabilitation counselor from Billings, Montana. Gibbs interviewed McMasters by telephone on four separate dates for a total of over three hours.

He also reviewed McMasters' medical and psychological records, including physical therapy notes and the report and deposition of Dr. Davis, his worker's compensation records, his DVR records, and his education and employment history.

[¶ 50]   Gibbs completed his evaluation and report on May 10, 2010.  He concluded that McMasters is not able to work in any capacity in the labor market and explained:

> In the course of completing this report, I have considered the opinions of Drs. Plemmons, Herter, and Blaney who have addressed the psychological components of Mr. McMasters' disability, as well as those of Drs. Zondag, Wieder, and Davis, who have addressed the physical components. After carefully analyzing their opinions, it is clear that Mr. McMasters cannot return to his pre-injury level of employment. The question is, can Mr. McMasters perform work at "any gainful occupation for which he is reasonably suited by experience or training."
>
> Any employee who works in the labor market must have the physical and psychological capacity to meet the demands of the work tasks.  Of paramount importance is the fact that the employee must be able to safely perform the work tasks in such a way that he/she does not incur any injury or place fellow workers or others in harm's way.  When considering Mr. McMasters['] current level of physical and psychological functioning, it is apparent that he is significantly impaired in both the physical and psychological domains.  His ability to work safely in an occupation for which he is reasonable [sic] suited by experience or training, in consideration of himself and others, is not feasible.
>
> If McMasters had only the psychological or the physical issues to overcome in consideration of employment for which he is reasonable [sic] suited, his chances of being successful in a job search would increase.  However, taken in tandem, the significance of impairment in both the physical and psychological domains preclude him from employment.  Even if one would ignore the psychological component of Mr. McMasters' disability, Dr. Davis has

made it abundantly clear that Mr. McMasters is physically incapable of performing work tasks without significant risk of further injury.  Thus, Mr. McMasters is not able to work in any capacity in the labor market.

[¶ 51]   In May 2010, the Division referred McMasters to Kelly White, MS, a vocational specialist from Dayton, Wyoming.  White interviewed McMasters in Casper, reviewed McMasters employment history, and under a section of her report titled "Medical Notes/Legal Notes" indicated "Mr. McMasters' file was reviewed."  In that section of her report, White referenced comments by Dr. Kaplan, Dr. Davis, DVR, and Dr. Herter.

[¶ 52]   White concluded that McMasters could return to employment and identified potential positions.  The potential positions White specified as meeting McMasters' transferable skills and physical capacity were:  Assembler, Small Products;  Order Clerk;  Tutor;  and Bill and Account Collector.  For each of these positions, White did not identify an available opening, but instead indicated "[t]here have been openings in the last six months and there are expected openings."  Regarding these positions, White made the following observations:

> The above jobs were identified based on Mr. McMasters['] physical limitations.  There is some question as to his emotional state and how it is affecting his return to work.  However, Mr. McMasters has demonstrated an ability to return to one semester of college and according to his self-report, he passed all but one class.  He would increase his vocational success if he:
>
> 1.   Return [sic] to work with a therapist on depression, anxiety, somatization and anger (these conditions have been known to improve with treatment).  There was also reference to a personality disorder.  This condition would have existed long before his injury and Mr. McMasters has demonstrated and [sic] ability to be in the work force with the affects [sic] of the personality disorder.  Counseling support would be helpful.
>
> 2.   Work [sic] with his doctors to ensure his pain medication is compatible with a work environment.  He will also need to

ensure his pain medication is appropriate for some one [sic] with "a long term history of alcohol, amphetamine and cannabis abuse in full time remission" (from 8/30/2007 Dr. Kaplan's impairment rating) The job of newspaper delivery route driver was also researched but it did not demonstrate any availability[.]

[¶ 53] White additionally identified the following potential positions specific to Casper, Wyoming: Call Center Sales; Collections Agent; and Gas Station Attendant. Regarding these positions, White provided the following prefatory comment:

An Internet job search was performed for Casper Wyoming 5/13/2010. The following jobs appear to meet his transferable skill level. Physical demands of the jobs are not always delineated on the Internet sight [sic] and it is not known if these jobs would meet his limitations. However, these are positions he may want to consider researching further[.]

[¶ 54] Following McMasters' application for Permanent Total Disability benefits, and the Division's denial of those benefits, a hearing was held before the Commission on June 3, 2010. On July 27, 2010, the Commission issued its decision upholding the Division's denial of benefits based on its findings that McMasters' inability to obtain gainful employment was due primarily to his psychological condition, which existed before his work injury, and his poor attempt at searching for work. On March 9, 2011, the district court entered its order affirming the Commission's decision.

## STANDARD OF REVIEW

[¶ 55] We review administrative decisions based on the factors set forth in the Wyoming Administrative Procedure Act, which provides:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2011).

[¶ 56] Under this statute, we review an agency's findings of fact by applying the substantial evidence standard. *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶ 22, 188 P.3d 554, 561 (Wyo.2008). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Bush v. State ex rel. Wyo. Workers' Comp. Div.*, 2005 WY 120, ¶ 5, 120 P.3d 176, 179 (Wyo.2005). " 'Findings of fact are supported by substantial evidence if, from the evidence preserved in the record, we can discern a rational premise for those findings.' " *Kenyon v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2011 WY 14, ¶ 11, 247 P.3d 845, 849 (Wyo.2011) (quoting *Bush*, ¶ 5, 120 P.3d at 179).

[¶ 57] With regard to an agency's determination that a claimant did not satisfy his burden of proof, this Court has said:

If the hearing examiner determines that the burdened party failed to meet his burden of proof, we will decide whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party by considering whether that conclusion was contrary

to the overwhelming weight of the evidence in the record as a whole. If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test. Importantly, our review of any particular decision turns not on whether we agree with the outcome, but on whether the agency could reasonably conclude as it did, based on all the evidence before it.

*Kenyon,* ¶ 12, 247 P.3d at 849 (quoting *Dale,* ¶ 22, 188 P.3d at 561).

[¶ 58] " 'We review an agency's conclusions of law *de novo,* and will affirm only if the agency's conclusions are in accordance with the law.' " *Kenyon,* ¶ 13, 247 P.3d at 849 (quoting *Moss v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2010 WY 66, ¶ 11, 232 P.3d 1, 4 (Wyo.2010)). In an appeal from a district court's appellate review of an administrative decision, we review the case as if it came directly from the hearing examiner, affording no deference to the district court's decision. *Deloge v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2011 WY 154, ¶ 5, 264 P.3d 28, 30 (Wyo.2011); *In re Kaczmarek,* 2009 WY 110, ¶ 7, 215 P.3d 277, 280 (Wyo.2009).

## DISCUSSION

[¶ 59] The Commission concluded that McMasters was not entitled to permanent total disability benefits, statutorily or under the odd lot doctrine. The Commission summed up the basis for its decision in Paragraph 37 of its findings of fact and Paragraph 7 of its conclusions of law. It stated:

37. Under the circumstances, and after reviewing all the evidence and testimony, this Panel finds that Mr. McMasters is not a credible witness; he has made only minimal efforts at returning to the work force, and has provided extremely inconsistent information to his medical providers regarding a variety of issues, particularly his personal limitations. This panel further finds that the opinion of Dr. Davis that Mr. McMasters is Permanently Totally Dis-

abled is not supported by the evidence, and that Dr. Davis relied excessively on the self-report of Mr. McMasters regarding his medical condition and incorrectly applied legal principals [sic] regarding the "Odd-lot Doctrine" and "taking employees as we find them". Although Mr. McMasters advised Dr. Davis that he was only able to sit for thirty minutes, this Panel observed Mr. McMasters sitting during the Evidentiary Hearing for up to an hour and twenty minutes without any apparent distress. In conclusion, this Hearing Panel finds and concludes that Mr. McMasters has not met his burden of proof in establishing that he is Permanently Totally Disabled.

\* \* \* \*

7. This Panel has analyzed this case under the "Odd–Lot Doctrine" as recognized in Wyoming, which provides that PTD may be awarded where a worker "who, while not all together incapacitated for work is so handicapped that they will not be employed regularly at any well known branch of the labor market." \* \* \* \* \* \* \*

Herein, Mr. McMasters was found to have the ability to pursue and complete college level classes, and Dr. Herter indicated that, "Intellectually and academically, Mr. McMasters would be capable of handling vocational-technical level coursework as well as coursework at the community college level. ...." In addition, his medical providers repeatedly found that he had the physical capacity to engage in light to sedentary work.

This Panel finds and concludes that Mr. McMasters' primary reasons for not returning to work are his psychological problems, which predate and are not caused by the work injury. He has not proved that he is physically incapable of suitable employment, in light of his limitations, including his mental capacity, education, training, and age. Mr. McMasters is still considered quite young at age 39, and his prior work history provides him with transferable skills that could be applied to other jobs. Dr. Kaplan noted that, after the final fusion surgery that he

was trying to walk a mile four times a week, has a valid driver's license, and would, "... likely do better in a sedentary, light duty position...." We further find that Mr. McMasters has not met his burden in establishing a prima facie "Odd-lot" case, and that he has residual physical abilities that would permit him to work in a sedentary or light duty job. In addition, this Panel also notes that Mr. McMasters is currently receiving some sort of interventional psychotherapy with Dr. Naginey in Casper, Wyoming, and is being considered for a nerve ablation treatment by Dr. Vilims and that these treatments, if successful, could positively affect Mr. McMasters' overall employability status. With the ongoing treatment, his young age, his stable work history and transferrable skills, this Panel is reluctant to find Mr. McMasters as Permanently and Totally Disabled.

Although we do not feel this is an "Odd-lot" case, we have analyzed Mr. McMasters' claim under that standard as well, and find that the Division has shown that there are gainful jobs available in the community that Mr. McMasters could perform on a regular basis in light of his limitations.

[¶ 60] We conclude that the Commission's findings of fact are unsupported by substantial evidence and that it has misapplied the law in its conclusion that McMasters is not entitled to permanent total disability benefits under the odd lot doctrine.

## A. *The Odd Lot Doctrine*

[¶ 61] The Wyoming Workers' Compensation Act defines the term "permanent total disability" as "the loss of use of the body as a whole or any permanent injury certified under W.S. 27–14–406, which permanently incapacitates the employee from performing work at any gainful occupation for which he is reasonably suited by experience or training." Wyo. Stat. Ann. § 27–14–102(a)(xvi) (LexisNexis 2011). The statutory definition is consistent with the odd lot doctrine, which permits a finding of permanent disability "in the case of workers who, while not altogether incapacitated for work, are so handicapped that they will not be employed regularly in any well known branch of the labor market." *Nagle v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2008 WY 99, ¶ 11, 190 P.3d 159, 164 (Wyo. 2008) (quoting *Cardin v. Morrison–Knudsen*, 603 P.2d 862, 863–64 (Wyo.1979)). Under the odd lot doctrine, a claimant who is not actually permanently totally disabled is eligible for permanent total disability benefits because his disability and other factors make him de facto unemployable. *Moss*, ¶ 13, 232 P.3d at 5; *State ex rel. Wyo. Workers' Safety & Comp. Div. v. Pickens*, 2006 WY 54, ¶ 14, 134 P.3d 1231, 1236 (Wyo.2006).

[¶ 62] The odd lot doctrine shifts the traditional burden of proof in a worker's compensation case.

> The claimant is required to make a *prima facie* showing that (1) "he is no longer capable of working at the job in which he was employed at the time of his injury," and (2) "the degree of obvious physical impairment, coupled with other facts, such as mental capacity, education, training, or age" qualify him for odd lot treatment. *City of Casper v. Bowdish*, 713 P.2d 763, 765 (Wyo.1986). Once a claimant has established his *prima facie* case, the burden shifts to the Division to show that light work of a special nature which the claimant could perform is available. *Id.* at 766.

*Pickens*, ¶ 14, 134 P.3d at 1236.

[¶ 63] To meet the second prong of his *prima facie* case, a claimant must demonstrate he made reasonable efforts to find work in his community after reaching maximum medical improvement or, alternatively, that he was so completely disabled by his work injury that any effort to find employment would have been futile. *Moss*, ¶ 14, 232 P.3d at 5; *Anaya v. Holly Sugar Corp.*, 928 P.2d 473, 475–76 (Wyo.1996).

[¶ 64] This Court has held that a claimant who fits within the odd lot doctrine need not show that he is totally incapable of doing any work at all to be entitled to permanent total disability benefits. *Pickens*, ¶ 13, 134 P.3d at 1235; *Schepanovich v. United States Steel Corp.*, 669 P.2d 522, 525 (Wyo.1983). We have explained:

"... The theory of counsel for the employer appears to be that the workman must go further than to show that he cannot do any hard work; that he must also show that he cannot do light work. Of course, it would almost be impossible, in many instances, for a man educated only to do hard work, to show that at some time or other some good Samaritan might not turn up and offer him some light work which he might be able to do. The law does not require impossibilities. It is stated in 71 C.J. 1071 that 'where it is found that the employee is permanently and totally disabled so far as hard or manual work is concerned, but that he might do light work of a special nature not generally available, the burden is on the employer to show that such special work is available to the employee.' ..." *In re Iles,* 56 Wyo. 443, 452, 110 P.2d 826 (1941).

*Schepanovich,* 669 P.2d at 525.

[¶ 65] Finally, this Court adopted the following rule stated in 2 Larson, *Workmen's Compensation Law,* § 57.61, at 10–164.95 to 1–164.114 (1982):

"... If the evidence of degree of obvious physical impairment, coupled with other facts such as the claimant's mental capacity, education, training, or age, places claimant *prima facie* in the odd-lot category, the burden should be on the employer to show that some kind of suitable work is regularly and continuously available to the claimant. Certainly in such a case it should not be enough to show that claimant is physically capable of performing light work, and then round out the case for noncompensability by adding a presumption that light work is available....

"The corollary of the general-purpose principle just stated would be this: If the claimant's medical impairment is so limited or specialized in nature that he is not obviously unemployable or relegated to the odd-lot category, it is not unreasonable to place the burden of proof on him to establish unavailability of work to a person in his circumstances, which normally would require a showing that he has made rea-

sonable efforts to secure suitable employment...."

*Schepanovich,* 669 P.2d at 528.

### B. *McMasters' Prima Facie Case*

[¶ 66] The first prong of McMasters' *prima facie* case, that he is no longer capable of working at the job in which he was employed at the time of his injury, is not in dispute. All of the physicians who examined McMasters agreed that physically he was restricted to light or sedentary duty, and the Division acknowledged at page 31 in its brief that "McMasters made a showing that he can no longer work in the HVAC field."

[¶ 67] We turn then to the second prong and the requirement that McMasters show that his physical impairment, coupled with other facts, such as mental capacity, education, training, or age qualify him for treatment under the odd lot doctrine. The evidence on this prong included:

—the report and testimony of Dr. Davis, the Division's own expert, who opined that McMasters was permanently and totally disabled and "[t]he combination of problems in this gentleman make him probably unsuitable for any employment;"

—the report and testimony of Reg Gibbs, an occupational therapist, that due to his combination of his physical impairment and his psychological concerns, McMasters "is not able to work in any capacity in the labor market;"

—the evaluation and report of Dr. Herter, the psychologist who met with McMasters on numerous occasions, and concluded, "[a]lone or in combination, Mr. McMasters' Panic Disorder, Pain Disorder and Major Depressive Disorder impede concentration, attention and short-term memory in a manner that would prevent him from being able to sustain simple, low stress, repetitive employment of any kind;" and

—the evaluation and report of Dr. Blaney, the Division-referred psychologist, who stated that McMaster could perform in a "low physical-impact,

low-stress job in an area of personal interest," if he were able to manage his anxiety and depression, which in a separate portion of his evaluation, he described as "unlikely," given McMasters' psychological profile.

[¶ 68] Consistent with the above evidence, McMasters testified that he takes pain medication three times daily, as prescribed by Dr. Vilims, and that he wears a TENS unit for pain. Regarding his job search, McMasters confirmed that he had applied for thirty positions and stated that he is currently registered with Job Service. He testified:

Q. Okay. I will look at Exhibit 1 from the Division, starting at page 6. Are these the places where you applied for work, Mr. McMasters?

A. This is actually the paper that I filled out. This is my handwriting, yes.

Q. Okay. And continuing on, did you apply to any places that you thought you might be able to get work?

A. Personally, I didn't think I would be able to get work anywhere. I applied to places that had advertisements looking for work.

Q. Okay. And are these places that you actually applied at, the places on the list, did you actually apply there?

A. Yes.

Q. All right. There was some suggestion in one of the records I saw or something from the Division that said that you allege that you were applying at places where you knew you couldn't get work anyway, like as an accountant or something like that. Did you do that?

A. I applied for one accountant job because there was—I had exhausted all other—the whole process to me is ridiculous. But I did my best to play along. I am very, very frustrated. And I am sorry, but this has been eight years.

[¶ 69] Given the evidence above, we find there can be no question that McMasters met his burden of showing that the degree of his physical impairment combined with his mental capacity, education, training, and age make him eligible for permanent total disability benefits. Four separate professionals

evaluated McMasters and concluded that the combination of his physical restrictions, pain and psychological condition has rendered him unemployable.

[¶ 70] The Commission concluded otherwise and rejected McMasters' *prima facie* showing. It reached its conclusion on essentially two grounds. First, it found that McMasters was not credible. That finding had a domino effect in the Commission's reasoning. From that finding, the Commission concluded that the reports of Dr. Davis and Reg Gibbs were not credible—Dr. Davis' report because he relied on the subjective complaints of McMasters, and the Gibbs report because he relied on Dr. Davis' report. The second ground for the Commission's rejection of McMasters' *prima facie* showing was its determination that McMasters' psychological impairments were the primary reason he could not return to work and those predated and were unrelated to his work injury. That is, the Commission found the opinions of Dr. Herter and Dr. Blaney credible and accepted them, but it nonetheless concluded that as a matter of law, McMasters was not entitled to permanent total disability benefits.

**1. Commission's Credibility Determinations**

[¶ 71] We consider first the Commission's finding that McMasters lacked credibility. This Court will defer to a fact finder's credibility determinations, but only where those determinations are supported by a rational premise. *Moss*, ¶ 30, 232 P.3d at 9. In this case, we find that premise missing.

[¶ 72] The Commission's stated reasons for finding McMasters lacked credibility were: 1) he has made only minimal efforts at returning to the work force; 2) he has provided "extremely inconsistent information" to his medical providers regarding a variety of issues, particularly his limitations; and 3) although McMasters told Dr. Davis that he was only able to sit for thirty minutes at a time, the Commission panel members observed him sitting for an hour and twenty minutes during the hearing without any apparent distress.

[¶ 73] We are at a loss to understand how McMasters' alleged minimal efforts at returning to work could affect his credibility. McMasters applied for work, and then he testified quite candidly that he was frustrated by the requirement because he felt it was a waste of time because of his disability. Given the tone of McMasters' testimony, it is clear that there was no deceit in his attempts to find work or in his testimony regarding the same. He may have been disgruntled, but he was not dishonest. Furthermore, to satisfy the second prong of his *prima facie* case, an employee must show he is unemployable, and applying for work is not the only way to do that. In fact, this Court has held that an employee is not required to show that he searched for work and could find none to prove he is permanently and totally disabled under the odd lot doctrine. *Nagle*, ¶ 16, 190 P.3d at 166. Given that McMasters' lackluster attempt at finding alternate employment is not a basis to reject his odd lot claim, we cannot see how it could be viewed as a basis to find he lacks credibility or as a basis to ignore other evidence of his disability.

[¶ 74] The Commission's next purported reason for finding that McMasters lacked credibility was that he provided "extremely inconsistent information" to his medical providers concerning his limitations. We again cannot accept the Commission's reasoning as a rational premise for finding McMasters lacked credibility. It is certainly conceivable that in seeing multiple medical providers and specialists over a period of seven years, McMasters may have felt differently and may have described his symptoms and limitations differently on different occasions. The Commission did not cite to specific examples of extreme inconsistencies that led to their finding, and in the absence of something more concrete, we cannot accept that the only or even a likely reason for variations in a patient's reporting under these circumstances is deceit or dishonesty.

[¶ 75] We find it noteworthy on this question that none of the medical providers or specialists who examined or evaluated McMasters reported that they found McMasters' complaints of pain to be lacking in credibility. The only provider the Commission pointed to as allegedly agreeing with their assessment of McMasters' credibility is psychologist Dr. Blaney. In particular, the Commission, in Paragraph 28 of its findings of fact, stated that the panel agreed with Dr. Blaney that "McMasters' representations about his physical condition are highly inconsistent with the medical records." The Commission's finding is a distortion of Dr. Blaney's comments. In his report, Dr. Blaney discussed how McMasters' psychological and emotional issues impacted his perceptions and recollections concerning treatment and caused him to believe that treatments had been unsuccessful, when the medical records in fact showed certain of the procedures to be helpful. Dr. Blaney did not suggest that McMasters was being dishonest about his pain or his disability. In fact, Dr. Blaney referred to McMasters' perception of his disability as "his essential, unalterable reality."

[¶ 76] Dr. Davis testified similarly. He testified that McMasters had an objectively verifiable physical injury and that the kind of pain McMasters was reporting was consistent with that injury. He also testified:

Q. And you answered some questions for Ms. Kempster about some of the pain that he reported was subjective. In other words, just based on his report. Was there anything about your physical examination that led you to believe that Mr. McMasters was not being truthful with you about the pain he was experiencing when you were examining him?

A. Let me think. No. No, in his mind, he was being truthful.

Q. And in your mind, did it appear to you that he was being truthful as well? In other words, you didn't pick up any sense of exaggeration or dishonesty in your evaluation of him?

A. I picked up no evidence of dishonesty. I thought he was exaggerating, yes, and I think that has to do with his complex psychological problem that this is superimposed on.

[¶ 77] The final basis the Commission offered as a reason to find McMasters lacked credibility was its observation that McMasters seemed to sit without apparent distress

during the hearing, contrary to the limitations on sitting that he had reported to Dr. Davis. This Court has on prior occasions cautioned the Commission against these types of impromptu medical diagnoses and reminded the Commission of its obligation to make its decision on the basis of the records and testimony entered into evidence. *Moss,* ¶ 30, 232 P.3d at 9; *Nagle,* ¶ 17, 190 P.3d at 166–67; *Rodgers v. Wyo. Workers' Safety & Comp. Div.,* 2006 WY 65, ¶ 41, 135 P.3d 568, 582 (Wyo.2006); *Decker v. Wyo. Workers' Safety & Comp. Div.,* 2005 WY 160, ¶ 34, 124 P.3d 686, 697 (Wyo.2005). We find the Commission's observations as unpersuasive in this case as we have in the other cited cases.

[¶ 78] The hearing was held via videoconference with panel members in Cheyenne and Sheridan, and McMasters and his attorney in Casper. It is difficult to understand, given the lack of proximity, how the panel members could clearly ascertain McMasters' distress or lack thereof. Additionally, we know from McMasters' testimony that he was using a TENS unit to alleviate pain during the hearing, which may be one reason he was able to sit for longer. Or perhaps the stress of the hearing was overriding the stress of the pain, or maybe he was having a good day, or maybe McMasters took days to recover from the hearing. We just do not know, and it is all of these unanswered questions that make these types of observations largely irrelevant. They simply provide very little helpful information and are a particularly flimsy basis for rejecting credibility.

[¶ 79] Based on the foregoing, we reject the Commission's finding that McMasters is not a credible witness. We also reject any of the findings that grew from that flawed determination, such as the Commission's findings that the reports of Dr. Davis and Reg Gibbs lacked credibility because they were based directly or indirectly on the subjective complaints of McMasters. We also note that, with respect to the opinions of Dr. Davis and Reg Gibbs, the record is clear that they relied on far more than the subjective complaints of McMasters.

### 2. *Commission's Psychological Determination*

[¶ 80] We turn next to the Commission's finding that the primary reason McMasters is unable to return to work is his psychological condition, and its conclusion of law that because the psychological condition predated McMasters' work injury, he is not entitled to permanent total disability benefits. The Commission's determination is not supported by substantial evidence and is not in accordance with law.

[¶ 81] The law has long recognized that an employee's right to worker's compensation benefits does not depend on the employee's condition or health or on his freedom from a susceptibility to injury due to constitutional weakness or latent tendency, but instead on the hazard of the employment acting on the particular employee in his then state of health. *Wright v. Wyo. State Training School,* 71 Wyo. 173, 189, 255 P.2d 211, 217–18 (1953); *see also Straube v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2009 WY 66, ¶ 17, 208 P.3d 41, 48 (Wyo.2009) (employer/Division takes employee as it finds him). This Court has stated:

> Compensation under our law is not to be denied because the injury would not have occurred except for the peculiar susceptibility of the individual worker.... [A]n award of compensation is not precluded because the risk is one which has not become generally recognized or because only employees unusually susceptible will suffer from [the disease].

*Wright,* 71 Wyo. at 191, 255 P.2d at 218 (citing *Webb v. New Mexico Pub. Co.,* 47 N.M. 279, 141 P.2d 333 (1943) (emphasis in original)).

[¶ 82] The odd lot doctrine is consistent with this premise in its provision for benefits when a claimant's work injury combined with some other factor, such as mental capacity, renders the claimant unemployable. The question in this case then is whether it is McMasters' psychological condition alone that is disabling him or whether it is the combination of his work injury and the underlying psychological condition that is disabling him. The record is clear that it is the combination of the two conditions that has permanently and totally disabled McMasters:

—Dr. Davis opined that it is the physical injury superimposed on the psychological condition that has made McMasters unsuitable for employment;

—Dr. Herter explained the debilitating effect the loss of McMasters' ability to perform heavy physical work had on him given his limited education and psychological condition and opined that McMasters was not employable; and

—Dr. Blaney reported that McMasters' psychological condition predated his work injury, but "his injury, pain, and unemployment have exacerbated underlying conditions and contributed to his present status."

[¶ 83] In addition to the professional opinions that it is the physical and psychological conditions acting in concert that have disabled McMasters, there is McMasters' condition before his 2003 work injury. We know from the record, and the Commission agreed,.that McMasters had a stable employment history before his injury. In the eleven years before his work injury, McMasters worked primarily in construction. Four of those years were as an HVAC apprentice, with another two years as an HVAC journeyman. Additionally, both McMasters and his wife testified that McMasters led an active and social life before his injury.

[¶ 84] The only conclusion that can be drawn from the record is that McMasters' physical impairment from his work injury combined with his underlying psychological condition to render him permanently and totally disabled. We thus conclude that McMasters met his *prima facie* case.

## C. *Division's Burden of Proof*

[¶ 85] Having established that McMasters made his *prima facie* case, we next consider whether the Division met its burden of showing that light work of a special nature that McMasters could perform was available. The Commission found that the Division met its burden with the report of Vocational Specialist Kelly White. We disagree.

[¶ 86] Kelly White's report identified potential positions for McMasters in Casper, Wyoming, subject to the caveat that the physical demands of the jobs were not known and "[t]here is some question as to [McMasters'] emotional state and how it is affecting his return to work." In other words, White's report did not identify even a single available position that McMasters could perform. The most the report did was identify positions that, as White phrased it, McMasters "may want to consider researching further." Of course, the Division did not meet its burden of proof with this offering, and again, we find no support for the Commission's determination otherwise.

## D. *Final Concerns with Commission's Decision*

[¶ 87] As a final matter, we address some of the additional grounds the Commission cited for rejecting McMasters' disability claim. Excerpting from the above-quoted conclusions of the Commission, it stated:

> Herein, Mr. McMasters was found to have the ability to pursue and complete college level classes, and Dr. Herter indicated that, "Intellectually and academically, Mr. McMasters would be capable of handling vocational-technical level coursework as well as coursework at the community college level. ...." * * * *
> * * * *
> * * * Mr. McMasters is still considered quite young at age 39, and his prior work history provides him with transferable skills that could be applied to other jobs. * * * In addition, this Panel also notes that Mr. McMasters is currently receiving some sort of interventional psychotherapy with Dr. Naginey in Casper, Wyoming, and is being considered for a nerve ablation treatment by Dr. Vilims and that these treatments, if successful, could positively affect Mr. McMasters' overall employability status. With the ongoing treatment, his young age, his stable work history and transferrable skills, this Panel is reluctant to find Mr. McMasters as Permanently and Totally Disabled.

[¶ 88] The above findings do not change the result in this case. With respect to the

suggestion that McMasters return to school and obtain additional training, this Court has held that the odd lot doctrine "does not encompass any obligation on the part of the injured employee to enter into any training program in order to improve his chances of employment." *Moss*, ¶ 34, 232 P.3d at 10. The Commission's reliance on such a requirement is contrary to law.

[¶ 89] With respect to McMasters' age, there is no evidence in the record to suggest his age is a factor or that his condition is one he will outgrow. With respect to the interventional psychotherapy by Dr. Naginey, the only evidence in the record is McMasters' testimony that he is seeing Dr. Naginey. The record contains no reports or evidence of any type detailing the progress of that treatment or its prospects for success. The Commission's reliance on Dr. Naginey's treatment to reject McMasters' claim is pure speculation unsupported by evidence. With respect to the nerve ablation treatment, the same is true. McMasters testified that Dr. Vilims was considering a procedure, "I don't know what it's called. It's basically the destruction of the nerves that are constantly firing and giving me this pain." The record contains no other evidence concerning "nerve ablation" treatment, and in particular no evidence from Dr. Vilims concerning the likelihood the procedure will be performed or will be successful. Again, the Commission's reliance on the treatment is speculation unsupported by evidence.

### CONCLUSION

[¶ 90] McMasters met his *prima facie* burden of establishing that he is unable to return to his former employment and that his work injury has combined with his psychological condition to render him permanently totally disabled under the odd lot doctrine. The Division presented no evidence of available employment that McMasters could perform. We reverse and remand to the district court for entry of an order remanding to the Commission for entry of an order awarding McMasters permanent total disability benefits.