# IN THE SUPREME COURT, STATE OF WYOMING

## 2021 WY 118

### OCTOBER TERM, A.D. 2021

### October 28, 2021

SCOTT TRIPLETT,

Appellant
(Petitioner),

v.

STATE OF WYOMING, ex rel.
DEPARTMENT OF WORKFORCE
SERVICES, WORKERS'
COMPENSATION DIVISION,

Appellee
(Respondent).

S-21-0090

*Appeal from the District Court of Uinta County*
*The Honorable Joseph B. Bluemel, Judge*

*Representing Appellant:*
> Donna D. Domonkos, Domonkos Law Office, LLC, Cheyenne, Wyoming.

*Representing Appellee:*
> Bridget Hill, Wyoming Attorney General; Mark Klaassen, Deputy Attorney General; Peter Howard, Senior Assistant Attorney General; Holli J. Welch, Assistant Attorney General.

*Before FOX, C.J., and DAVIS, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]    The Medical Commission Hearing Panel (the Medical Panel) determined that Scott Triplett failed to meet his burden to show entitlement to a right hip replacement concluding the proposed surgery was not a reasonable and necessary treatment for a work related injury.  The district court affirmed.  Mr. Triplett appeals claiming, "because the Medical Commission substituted its opinion for the experts' opinions," its decision was arbitrary and capricious.  We affirm.

*ISSUE*

[¶2]    Did the Medical Panel substitute its opinion for those of the experts making its decision arbitrary, capricious, or otherwise not in accordance with the law?

*FACTS*

[¶3]    On January 6, 2016, Mr. Triplett slipped on the ice while at work.  He fell to his left knee and landed on his left hip resulting in a labral tear.  Mr. Triplett was seen at Hofmann Arthritis Institute where, after several months of nonsurgical treatment, he underwent a failed left hip arthroscopy to repair the tear.  On August 9, 2017, he received a total left hip replacement.  Mr. Triplett's left hip replacement was compensable because it was found to be related to his workplace injury.

[¶4]    While the left hip replacement increased Mr. Triplett's mobility, his left leg was, as a result, three-fourths to one inch longer than his right, and the replacement failed to relieve his left leg or preexisting lower back pain.[1]  He continued to receive treatment for his left hip, leg, and lower back pain.  Eventually, pain began to radiate down his right hip and leg.

[¶5]    Dr. Daniel Mangiapani assisted the lead surgeon, Dr. Jordan Schaeffer (who later left the practice), in Mr. Triplett's left hip replacement.  On December 24, 2018, he saw Mr. Triplett for a routine follow-up on the left hip replacement.

[¶6]    On January 22, 2019, Dr. Mangiapani wrote the Workers' Compensation Division requesting preauthorization for a total right hip arthroplasty for Mr. Triplett.  His letter set forth his reasons:

---

[1] In 2002 or 2003, Mr. Triplett injured his back at work.  In 2006, he suffered a second muscle strain of his back but returned to work several days later.  Since 2001, Mr. Triplett has received chiropractic treatments one time per month "for sore muscles and joints and [to] 'help stay in balance.'"

1

I have followed Scott Triplett for over 1 year for his bilateral hip pain and discomfort. He has been examined, interviewed and evaluated with imaging. He has bilateral hip joint degenerative disease that has resulted in significant pain and disability to the point where one of his hip joint [sic] has been replaced. Due to the symbiotic nature of bilateral hip joints and osteoarthritis has a systemic inflammatory component to it, it is my opinion that these issues are at least partially related. He has failed non-operative treatment on his contralateral hip joint to the point where his pain and disability has made him a candidate for a hip replacement.

[¶7] The Workers' Compensation Division denied preauthorization, determining Mr. Triplett's right hip issues were unrelated to the work injury. The matter was referred to the Medical Panel.

[¶8] The parties submitted Mr. Triplett's medical records to the Medical Panel including those from the Hofmann Arthritis Institute and Utah Pain and Rehab. The parties also submitted Dr. Mangiapani's written request for preauthorization, *supra* ¶ 6; Dr. Mangiapani's deposition testimony; a written report from Dr. G.P. Massand, who had conducted an independent medical examination of Mr. Triplett; and Dr. Massand's deposition testimony. Mr. Triplett was the sole witness at the hearing.

**Dr. Mangiapani's Deposition Testimony**

[¶9] In his deposition, Dr. Mangiapani testified he saw Mr. Triplett "two to three times." He stated:

I thereafter followed him for his hip replacement and then evaluated him for his contralateral side of the hip, which was also degenerative. And we came to the conclusion that he had failed conservative treatment and was a good candidate, given his excellent results on the first side, . . . to pursue a joint replacement surgery on his opposite side on the hip.

[¶10] The only records of interaction between Dr. Mangiapani and Mr. Triplett are those of the left hip replacement surgery and the December 24, 2018 consultation. Dr. Mangiapani testified he did not see Mr. Triplett after the December 2018 visit. Dr. Mangiapani did not review records from any provider, other than the Hofmann Arthritis Institute, and did not obtain imaging studies from any other provider. He had not seen Dr. Massand's report at the time of his deposition and did not know that Mr. Triplett had osteoarthritic disease in either hip before the work injury.

[¶11]  When asked if he was familiar with Mr. Triplett's medical history, Dr. Mangiapani answered, "I would categorize it [my involvement] as peripheral since I more or less took over his case once Dr. Schaeffer had left the practice."  Dr. Mangiapani described the December 24, 2018 examination as follows:

> At that point, he was doing well.  And he had kind of known longstanding lower back issues and then began complaining of symptoms in his right hip.  So that was evaluated.  An x-ray evaluation was made during that visit,[2] which also revealed that he had a similar degenerative process on his right side regarding the cartilage loss in the joints and the degree of degenerative joint disease.
>
> We had a discussion as to what he had done nonoperatively, including oral medications, some form of home exercise program, activity modification, attempts at weight loss.  And those . . . had all been unsuccessful regarding his right hip to that point.

[¶12]  Dr. Mangiapani diagnosed "right hip osteoarthritis recalcitrant to nonoperative treatment."  He read from his notes stating, "Has failed nonoperative . . . treatment on right side, including corticosteroid injection . . . , physical therapy, activity modification. . . . Plan on right total hip arthroplasty."

[¶13]  Dr. Mangiapani concluded Mr. Triplett's issues on his right side were "at least partially related" to his January 2016 work injury explaining:

> So in general, if you have one joint replacement on one side of your body, the odds of you getting another joint replacement on the other side of your body in your lifetime is roughly 50 percent. . . . And to . . . say that one joint is completely separate from the other is largely incorrect. . . . [I]t's been scientifically proven in basic science models that if you have arthritis on one side of your body, there is an inflammatory response that can have an effect on the other side of the body.

[¶14]  When asked if the right hip condition is a direct and continuing consequence of the work injury to the left hip, Dr. Mangiapani responded, "I'd refer to my note where it says

---

[2] Although at his deposition, he agreed to provide the x-ray study from Mr. Triplett's December 2018 appointment, no x-rays were provided.

these issues are partially related. So when you ask me is it a direct [sic], that's probably . . . not appropriate." When asked, is it more probable than not that the right hip condition was a consequence of the work injury, Dr. Mangiapani replied, "At least partially a consequence." When asked if he was saying it was greater or less than 50 percent, he said, "Given that someone who's never had an injury has a 50 percent chance of getting their other hip replaced, I would say greater than 50 percent[.]"

**Dr. Massand's Report and Testimony**

[¶15] Dr. Massand, an orthopedic surgeon, conducted an independent medical examination of Mr. Triplett's injuries. Dr. Massand's report states that Mr. Triplett's subjective history of his complaint included the events of January 6, 2016, and the progressive increase in pain in his lower back and left hip. Due to the passage of time, Mr. Triplett was unable to provide details regarding his treatment. Mr. Triplett complained of continuing pain in low back, left hip, left buttock, and left leg. "He also has some symptomatology in right hip which he states started after having left total hip replacement and not before." Dr. Massand reported that Mr. Triplett's "stance and posture appear unremarkable; however, he appears to have significant abnormality of gait and keeps his back stiff and walks with a short stance on left with a limp." At the time of the examination, Mr. Triplett was not using any "assistive device such as cane or crutch."

[¶16] Dr. Massand's report includes his review of Mr. Triplett's medical records from all his providers. Based on his examination and the medical records, Dr. Massand concluded:

> [1.] The patient apparently has preexisting joint inflammatory disease and osteoarthritis of right hip, which are not related to accident. . . .
>
> .    .    .
>
> [2.] [T]he patient has preexisting osteoarthritis along with comorbidities such as obesity, chewing tobacco and/or smoking, and deconditioning of his back and hips due to chronic pain and depression.
>
> .    .    .
>
> [3.] The patient's problems with right hip are not related to his accident of 01/06/2016, as he did not complain of any pain in his right hip and right leg, restriction of range of motion, or limp following his accident of 01/06/2016. His

4

symptoms in right hip appear to have started following total hip arthroplasty of left hip.

[¶17]   At his deposition Dr. Massand testified:

> Q.      And your history indicates that [Mr. Triplett] began having symptoms in the right hip following the appearance of the antalgic gait?[3]
>
> A.      My . . . examination revealed that he had antalgic gait following his total hip replacement.
>
> Q.      . . . Do you believe that the left hip arthroplasty resulted in a leg length discrepancy that caused an antalgic gait in Mr. Triplett?
>
> A.      That's correct.
>
> Q.      Do you believe that antalgic gait caused his arthritic right hip to become painful?
>
> A.      Yes.
>
> Q.      Do you believe that the antalgic gait combined with the osteoarthritis in his right hip caused his right hip pain?
>
> A.      I don't know how bad the arthritis he had, but the pain may have increased after his left total hip replacement.
>
> Q.      Do you believe that the antalgic gait accelerated the osteoarthritic condition in Mr. Triplett's right hip?
>
> A.      **I don't think so.**
>
> .    .    .
>
> A.      As I said, I do remain [sic] right hip became painful following total hip replacement on left side.   But I can't comment that arthritis was increased because of that and the

---

[3] An "antalgic gait" is a general term for a walking pattern that results from having pain somewhere.

need for total hip replacement because I don't know how bad [his] arthritis is. I've not been provided x-rays.

. . .

Q. [On page 35 of your report, fifth paragraph,] [t]he last sentence of that paragraph reads, "Dr. Hofmann and Dr. Daniel Mangiapani have opined that these issues are at least partially related to his work injury and partially due to systemic inflammatory component and osteoarthritis." . . . Do you agree with Dr. Hofmann and Dr. Mangiapani?

. . .

[A.] Yes. As I mentioned that his symptoms were aggravated due to antalgic gait, but I don't know whether arthritis was aggravated or what was the condition of arthritis, and there was no history of injury. So I concur in the sense it partially **could be** due to the accident and – or due to total hip replacement . . . and antalgic gait.

(Emphasis added.)

[¶18] Dr. Massand noted he had not been provided with any diagnostic studies of the pathology in the right hip for which Mr. Triplett had been advised he needed a total hip replacement. Dr. Massand stated he would not operate on someone just because of pain. More particularly, he said, "[y]ou have to have severe pain to have artificial joint, and severe arthritis, because there are a lot of complications after total joint replacement. So I can't say . . . that I would recommend it because I haven't seen the diagnostic studies."

**Mr. Triplett's Testimony**

[¶19] Mr. Triplett testified that on January 6, 2016, as he was walking into work, his right foot slid forward on the ice while the left foot remained in place. He "did the splits forward and backward, down to [his] left knee and then onto [his] side. And when [he] did, it twisted [his] hip – both hips, one forward and one backward." Mr. Triplett described his recovery from the left hip replacement:

I did all the physical therapy. I showed up faithfully three days a week. I got more strength. I got more stamina. I got more balance. I worked through the replacement, but the pain in my lower back started to radiate down my right side because my right hip was doing all the work getting my left

6

hip healed up. It put so much strain on my right hip it started to hurt.

[¶20] At the time of the injury, Mr. Triplett testified he weighed 250 to 260 pounds. After the injury, he "quickly" gained weight and weighed 325 pounds at the time of the hearing.

[¶21] Mr. Triplett said he saw Dr. Mangiapani "quite often right after [his] left hip replacement" and told him of his right-side pain "about six months" after the left hip replacement and was told to give "physical therapy a shot" to relieve the pain on his right side. (There is no documentation in Mr. Triplett's medical record indicating any treatment to his right hip or leg.) Mr. Triplett testified at his first visit with Dr. Mangiapani, he had x-rays. (The record does not contain an x-ray of his right hip.) At his second visit a few months later, Dr. Mangiapani "looked [his right hip] over and said it's just absolutely going to have to be replaced." (The medical records contain no documentation of two consultations with Dr. Mangiapani.)

[¶22] Mr. Triplett testified he told Dr. Massand he had "constant pain in [his] low back, both buttocks, both hips, and left leg, with numbness in his left leg. And occasional numbness in his right foot." He stated he continues to have severe pain in the mid and low-back area, which is why he "[has] to keep standing up." Contrary to his history of back injuries, he told Dr. Massand he had never injured his lower back and explained this omission was because he "never broke a bone or anything in that [it] had to be fixed."

[¶23] Mr. Triplett recounted the problems caused by his abnormal gait and stated, "it's a matter of my hips twisting to accommodate for it hurts my low back. I have to hold with my lower back muscles." A member of the Medical Panel then asked Mr. Triplett a series of questions:

> Q. Mr. Triplett, you have been standing up and down here a few times[.] What is bothering you that makes you have to stand up?
>
> . . .
>
> A. It hurts. It hurts in my hip and in my lower back. It burns and stabs. It's a stabbing constant burning pain that increases and increases until I change position. I stand up and [it] relieves it for a minute. It starts to hurt again, so I sit down and [it] relieves it for [a minute].
>
> Q. Does lying down help it?

7

A.      Yes.  If I lay correctly.

Q.      . . . [I]t sounded to me as if you felt you were having problems bearing weight on each leg.  When you are [standing] on your left leg and taking a step with your right foot, right leg, does it feel as if your hip is dropping down on the right side?  You have to lift your foot up farther on the right or higher on the right in order to keep from stumbling; is that correct?

A.      Yes.

**The Medical Panel's Decision**

[¶24]  The Medical Panel determined that Mr. Triplett "[did] not [meet] his burden of proof to establish that the total right hip arthroplasty is [a] reasonable and necessary medical treatment for any injury related to his work injury."

[¶25]  The Medical Panel found Mr. Triplett's testimony "was not credible or reliable in critical respects."  His testimony regarding the onset of his right hip pain within six months of the left total hip replacement was not supported by the medical records.  His pain drawings and reports of pain from October 2017 through October 2018, made during intake at each treatment at the Hofmann Arthritis Institute, identified pain only in his left leg and low back.  There was no mention of right hip or leg complaints.  This was also true of the medical records from Mr. Triplett's treatment at Utah Pain and Rehab in April and May 2018.  The Medical Panel noted these records do include a report of occasional radiating pain into the right leg in June 2018 and occasional numbness and tingling in the right foot in July 2018.  However, the Medical Panel remarked that in the notes from a pain management visit on December 17, 2018, a week before Mr. Triplett saw Dr. Mangiapani, there was no mention of right hip pain.  The Medical Panel found it significant that after seeing Dr. Mangiapani on December 24, 2018, at his next pain management appointment Mr. Triplett reported "a burning pain that is radiating into both hips now and both legs causing sciatic pain."  The Medical Panel also observed there were no imaging reports of osteoarthritis in the right hip.

[¶26]  The Medical Panel also found Dr. Mangiapani's testimony was not credible as to diagnosis, causation, or treatment.  The Medical Panel noted Dr. Mangiapani testified he had only seen Mr. Triplett two or three times, one of these being the left hip surgery.  He had not reviewed any medical records or imaging studies from any other provider.  He was not aware of whether or not Mr. Triplett had preexisting osteoarthritis of either hip, and was not familiar with any of the details of the work accident.  The Medical Panel specifically noted Dr. Mangiapani's testimony as to causation:

8

> So my opinion and giving – knowing that he was a man who has sustained an injury, has **had issues with both of his hips since then**, which is, you know, having only met him, that it could certainly contribute to the acceleration of that process. So to go back and say is – is it possible to have osteoarthritis prior to having an injury? Yes, that's correct. But to become symptomatic from it to the point where you're failing non-operative treatment of all kinds, to the point where you require joint replacement surgery, that could easily be exacerbated and explained **by an injury on both sides**.

The Medical Panel recognized this testimony conflicted with Mr. Triplett's testimony that the right leg only became problematic after his left hip surgery.

[¶27] The Medical Panel addressed Dr. Mangiapani's testimony stating:

> Dr. Mangiapani had a poor understanding of [Mr.] Triplett's progress after his left hip arthroplasty as is evidenced by a comparison of the medical records and Dr. Mangiapani's testimony. In that same regard, Dr. Mangiapani's testimony was undermined by the fact that he had not reviewed any other medical records. Indeed, the medical records that were provided did not support Dr. Mangiapani's testimony regarding continuing complaints of right hip pain, purported findings from imaging studies, and failure of non operative [sic] treatment of the right hip. There was very little, if any, documentation in the record to support his opinions. Finally, in the absence of the imaging studies or other diagnostic treatments, with regard to Dr. Mangiapani's recommendation for a total right hip arthroplasty the Hearing Panel agreed with Dr. Massa[n]d's assessment that surgery was not indicated just to relieve pain and not knowing what, if any, pathology is causing the pain. Further, given the less than excellent result from the left hip arthroplasty, another basis for Dr. Mangiapani's recommendation fails.

[¶28] The Medical Panel also conducted a detailed review of Dr. Massand's report and deposition testimony. The Medical Panel discussed Dr. Massand's report, which set forth an extensive review of Mr. Triplett's medical records from before and after the work-related injury and the results of Dr. Massand's physical examination. The Medical Panel recognized Dr. Massand testified that an antalgic gait such as Mr. Triplett's "would 'very rarely' cause symptoms on the right."

9

[¶29]  At his deposition, Dr. Massand testified regarding several possible causes of Mr. Triplett's right hip pain: "it's a possibility [Mr. Triplett] may have slight aggravation"; "there is likelihood as to arthritis of right hip was degenerative and may have been slightly aggravated due to . . . the favoring of his [right] hip"; and Mr. Triplett's osteoarthritis may have been "aggravated" by his significant weight gain and tobacco use.

[¶30]  The Medical Panel rejected the portion of Dr. Massand's testimony which would "support a finding that [Mr.] Triplett may have suffered a 'slight' aggravation of his preexisting asymptomatic osteoarthritis of the right hip or that he may have developed right hip pain as a result of an altered gait resulting from the left hip arthroplasty[.]"  The Medical Panel explained, "[I]t appear[ed] [Dr. Massand] was taking [Mr.] Triplett's word for it that the right hip became symptomatic after the left hip arthroplasty . . . before any actual complaints of right hip pain were documented, including [Mr.] Triplett's own pain drawings."  As a result, the Medical Panel found "that those opinions . . . lack[ed] sufficient foundation."

[¶31]  The Medical Panel's application of the facts to the law includes a paragraph stating:

> [T]here was a failure of proof in this case as the [Medical] Panel was not persuaded that [Mr.] Triplett['s] pain was originating from his right hip as most of the pain that he described, and his description of the movements that caused him pain, pointed to the back as a source of the pain.  **Indeed the [Medical] Panel noted that [Mr.] Triplett stood up three to four times during the hour hearing which indicated to the [Medical] Panel that the source of his pain was related more to the back [than] the hip as persons suffering from hip pain do not generally find relief standing up, rather standing up aggravates the hip pain.**

(Emphasis added.)

[¶32]  The Medical Panel concluded that "the preponderance of the evidence does not support" Mr. Triplett's complaints that the right hip pain resulted from the work injury, and "the proposed total right hip arthroplasty for that condition is not [a] reasonable and necessary treatment for the work related injury."

### *DISCUSSION*

[¶33]  Mr. Triplett maintains that the Medical Panel's comments directed at his actions—standing to achieve pain relief—established that the Medical Panel made the equivalent

10

of an independent examination. It then relied on that examination, as opposed to the evidence, in denying Mr. Triplett's request for worker compensation benefits.

## *STANDARD OF REVIEW*

[¶34] We review an administrative appeal as if it came directly from the administrative agency, giving no deference to the district court's ruling on the appeal. *Boyce v. State ex rel. Dep't of Workforce Servs., Workers' Comp. Div.*, 2017 WY 99, ¶ 21, 402 P.3d 393, 399–400 (Wyo. 2017); *Price v. State ex rel. Dep't of Workforce Servs., Workers' Comp. Div.*, 2017 WY 16, ¶ 7, 388 P.3d 786, 789 (Wyo. 2017). Wyo. Stat. Ann. § 16-3-114(c) governs our standard of review:

> (c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:
>
> > (i) Compel agency action unlawfully withheld or unreasonably delayed; and
> >
> > (ii) Hold unlawful and set aside agency action, findings and conclusions found to be:
> >
> > > (A) **Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;**
> > >
> > > (B) Contrary to constitutional right, power, privilege or immunity;
> > >
> > > (C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;
> > >
> > > (D) Without observance of procedure required by law; or

11

**(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.**

Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2021) (emphasis added).

> [T]he substantial evidence standard will be applied any time we review an evidentiary ruling. . . . If the hearing examiner determines that the burdened party failed to meet his burden of proof, we will decide whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole. . . . If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test.

*Dale v. S & S Builders, LLC*, 2008 WY 84, ¶ 22, 188 P.3d 554, 561 (Wyo. 2008).

[¶35] We review an agency's conclusions of law de novo and affirm only if its conclusions are in accordance with the law. Wyo. Stat. Ann. § 16-3-114(c)(ii)(A).

> We also use the arbitrary and capricious standard of review as a "safety net" to catch agency action which prejudices a party's substantial rights or which may be contrary to the other review standards under the Administrative Procedure Act, yet is not easily categorized or fit to any one particular standard. This standard is not meant to apply to true evidentiary questions, but it instead applies when, for example, the agency failed to admit testimony or other evidence that was clearly admissible, or failed to provide appropriate findings of fact or conclusions of law. This standard also applies when a medical hearing panel takes notice of contested material facts that are not in evidence.

*McIntosh v. State ex rel. Wyoming Workers' Safety & Comp. Div.*, 2013 WY 135, ¶ 31, 311 P.3d 608, 616 (Wyo. 2013) (internal citations and quotation marks omitted).

> The arbitrary and capricious test requires the reviewing court to review the entire record to determine whether the agency

> reasonably could have made its finding and order based upon all the evidence before it. The arbitrary and capricious standard is more lenient and deferential to the agency than the substantial evidence standard because it requires only that there be a rational basis for the agency's decision.

*Matter of Worker's Comp. Claim of Vinson*, 2020 WY 126, ¶ 27, 473 P.3d 299, 309 (Wyo. 2020) (quoting *Tayback v. Teton Cnty. Bd. of Cnty. Comm'rs*, 2017 WY 114, ¶ 13, 402 P.3d 984, 988 (Wyo. 2017)). "Importantly, our review of any particular decision turns not on whether we agree with the outcome, but on whether the agency could reasonably conclude as it did, based on all the evidence before it." *Worker's Comp. Claim of Bailey v. State ex rel. Dep't of Workforce Servs.*, 2015 WY 20, ¶ 11, 342 P.3d 1210, 1213 (Wyo. 2015) (quoting *Dale*, ¶ 22, 188 P.3d at 561).

## *ANALYSIS*

[¶36] Mr. Triplett argues the Medical Panel's decision is arbitrary and capricious, and not in accord with law because causation was established when both Dr. Mangiapani and Dr. Massand testified that his right hip problems were aggravated by his antalgic gait after the left hip replacement. He claims that rather than accepting this uncontested evidence, the Medical Panel substituted its opinion for that of the medical experts. The Workers' Compensation Division disagrees, contending the Medical Panel analyzed the experts' opinions and explained its findings that the experts lacked credibility on causation. It contends that the Medical Panel's conclusion (that Mr. Triplett failed to meet his burden of proof) is supported by substantial evidence.

[¶37] An employee bears the burden of proving a compensable injury "arising out of and in the course of employment[.]" Wyo. Stat. Ann. § 27-14-102(a)(xi) (LexisNexis 2021). To show that the compensable injury arises out of or in the course of employment, the workers' compensation claimant has the burden of proving a causal connection between the work-related incident and the injury by a preponderance of the evidence. *Boyce*, ¶ 22, 402 P.3d at 400. The causal connection must be shown "to a reasonable degree of medical probability." *Id.* (quoting *Leib v. State, ex rel., Dep't of Workforce Servs., Workers' Comp. Div.*, 2016 WY 53, ¶ 12, 373 P.3d 420, 424 (Wyo. 2016)). A second compensable injury occurs when "an initial compensable injury ripens into a condition requiring additional medical [treatment]." *In re Kaczmarek*, 2009 WY 110, ¶ 9, 215 P.3d 277, 281 (Wyo. 2009) (quoting *Yenne-Tully v. Workers' Safety & Comp. Div., Dep't of Emp.*, 12 P.3d 170, 172 (Wyo. 2000)). When a second compensable injury compounds a preexisting condition, "Wyoming law does not require a change in the underlying pathology to find a material aggravation. What it requires is that the work injury combine with the preexisting condition to create the present disability and need for treatment." *In re Vandre*, 2015 WY 52, ¶ 36, 346 P.3d 946, 960 (Wyo. 2015) (quoting *Judd v. State ex rel. Wyoming Workers' Safety & Comp. Div.*, 2010 WY 85, ¶ 36, 233

P.3d 956, 970 (Wyo. 2010)). Mr. Triplett bore the burden of establishing that his right hip pain was a second compensable injury.

[¶38] The claimant's burden "[t]ypically . . . requires expert medical testimony that it is more probable than not that the work contributed in a material fashion to the precipitation, aggravation, or acceleration of the injury." *Boyce*, ¶ 22, 402 P.3d at 400 (quoting *Leib*, ¶ 12, 373 P.3d at 424). "[M]embers of the [Medical Panel] have medical expertise which enables them to understand and render decisions in technical cases like this one. As the trier of fact, the [Medical Panel] must weigh the evidence and determine witness credibility." *Boyce*, ¶ 26, 402 P.3d at 401 (quoting *Price*, ¶ 15, 388 P.3d at 791).

[¶39] Mr. Triplett recognizes the Medical Panel "is entitled to disregard expert medical opinion if it finds the opinion unreasonable, not adequately supported by the facts upon which the opinion is based, or [if it is] based upon an incomplete or inaccurate medical history." *Boyce*, ¶ 26, 402 P.3d at 401 (citations and internal quotation marks omitted); *McMillan v. State ex rel. Dep't of Workforce Servs., Workers' Comp. Div.*, 2020 WY 68, ¶ 11, 464 P.3d 1215, 1219 (Wyo. 2020). He claims, however, that while the Medical Panel *appeared* to weigh both experts' opinions, it was not weighing the evidence when it determined that Mr. Triplett's standing up and sitting down several times throughout hearing "related more to the back [being injured than] the hip as persons suffering from hip pain do not generally find relief standing up, rather standing up aggravates the hip pain." Mr. Triplett concludes that no expert testified that standing up aggravates hip pain, and therefore, the Medical Panel's insertion of its own diagnosis was not in accordance with the law.

[¶40] Mr. Triplett cites *Worker's Comp. Claim of Decker v. State ex rel. Wyoming Med. Comm'n*, 2005 WY 160, ¶ 34, 124 P.3d 686, 697 (Wyo. 2005). In *Decker*, we reversed the Medical Commission's finding that Mr. Decker failed to meet his burden of proof. We held that the Medical Panel's decision was insufficient because it did "not specify the inconsistent physical findings or the gaps in history the Commission found material." *Id.* ¶ 30, 124 P.3d at 696. In addition, we concluded that, "[i]nstead of weighing the medical opinions and other evidence, the Medical Commission appears to have independently diagnosed Decker based on symptoms reported by Decker and described in his medical records" and by "us[ing] the information elicited in response to [the Medical Panel's] questions to diagnose Decker." *Id.* ¶¶ 31–32, 124 P.3d at 696. We stated:

> As the hearing examiner in medically contested cases, the Medical Commission is tasked with weighing the medical and other evidence presented to it by the parties. ***It is not tasked with providing the equivalent of an independent medical examination and opinion.***

*Decker*, ¶ 34, 124 P.3d at 697 (emphasis added); *see also McMasters v. State of Wyoming ex rel. Wyoming Workers' Safety & Comp. Div.*, 2012 WY 32, ¶ 77, 271 P.3d 422, 441 (Wyo. 2012) ("This Court has on prior occasions cautioned the Commission against these types of impromptu medical diagnoses and reminded the Commission of its obligation to make its decision on the basis of the records and testimony entered into evidence." (citing *Moss v. State ex rel. Wyoming Workers' Safety & Comp. Div.*, 2010 WY 66, ¶ 30, 232 P.3d 1, 9 (Wyo. 2010); *In re Nagle*, 2008 WY 99, ¶ 17, 190 P.3d 159, 166–67 (Wyo. 2008); *Worker's Comp. Claim of Rodgers v. State ex rel. Wyoming Workers' Safety & Comp. Div.*, 2006 WY 65, ¶ 41, 135 P.3d 568, 582 (Wyo. 2006))).

[¶41]   Here, while the Medical Panel, inappropriately, referred to matters which were not in evidence—persons suffering from hip pain generally do not find relief from standing up—our review must consider the entire record to determine if the Medical Panel's conclusion was arbitrary or capricious or not in accord with the law, taking "due account . . . of the rule of prejudicial error." Wyo. Stat. Ann. § 16-3-114(c).  In other words, we ask, despite the erroneous insertion of its independent opinion, was there otherwise a rational basis for the Medical Panel's conclusions?  We find there was.

[¶42]   Mr. Triplett's pain at the time of the hearing was not contested.  Both experts testified Mr. Triplett suffers from degenerative osteoarthritis.  Contrary to Mr. Triplett's assertion, however, the record contains conflicting evidence as to the *cause* of the pain in his right leg.  The Medical Panel specifically noted the discrepancies and gaps in the evidence, including Mr. Triplett's failure to report pain in his right leg and hip to his medical providers for over a year.  *See Boyce*, ¶ 33, 402 P.3d at 402 (timing of symptoms is relevant to causation).

[¶43]   The Medical Panel fully explained the reasons it discounted certain opinions of the experts on causation.  Dr. Mangiapani had only seen Mr. Triplett two or three times, had not reviewed medical records from any other provider, was not aware of Mr. Triplett's preexisting osteoarthritis, and was not familiar with any of the details of the work accident.  It contrasted Dr. Mangiapani's diagnosis with Dr. Massand's testimony—that an antalgic gait would very rarely cause symptoms.  It found that Dr. Massand's conclusion that the antalgic gait may have aggravated his right hip was based solely on Mr. Triplett's self-reporting and lacked foundation.

[¶44]   Both doctors were equivocal on the issue of causation.  Dr. Mangiapani testified the right hip issues were "partially related" to his work injury and "that if you have arthritis on one side of your body, there is an inflammatory response that can have an effect on the other side of the body."  Dr. Massand's opinion that the left hip surgery could be related to the right hip was stated in terms of "possibility" and that Mr. Triplett "may have slight aggravation."  "We have recognized that medical opinions expressed in terms of 'can,' 'could,' or 'possibly' are speculative and have upheld a fact finder's rejection of such opinions."  *Boyce*, ¶ 31, 402 P.3d at 402 (quoting *Matter of Worker's*

15

*Comp. Claim of Jensen v. State*, 2016 WY 87, ¶ 28, 378 P.3d 298, 307 (Wyo. 2016)). Mr. Triplett does not take issue with the Medical Panel's reasoning on appeal. Moreover, Mr. Triplett does not challenge the Medical Panel's conclusion that Dr. Mangiapani's opinions were based on an inaccurate and incomplete medical history, or its conclusion that Dr. Massand's comments on causation lacked foundation.

[¶45] Having reasonably rejected the opinions of the medical experts as to causation, the Medical Panel did not err when it concluded Mr. Triplett did not carry his burden on causation or the reasonableness of his proposed medical treatment. *See Boyce*, ¶ 50, 402 P.3d at 405 (After reasonably rejecting the expert opinions, "[g]iven the record before the Medical Commission, we cannot say the Commission acted contrary to the overwhelming weight of the evidence in finding that Mr. Boyce did not meet his burden of proof.").

## *CONCLUSION*

[¶46] The Medical Panel's determination is supported by substantial evidence and is not arbitrary, capricious, or otherwise contrary to the law. We affirm.